332 So.2d 789 (1976)
STATE of Louisiana
v.
Edward GILMORE.
No. 57343.
Supreme Court of Louisiana.
May 17, 1976.
Rehearing Denied June 18, 1976.
*791 Horace P. Rowley, III, Clyde D. Merritt, Orleans Indigent Defender Program, New Orleans, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Louise S. Korns, Asst. Dist. Atty., for plaintiff-appellee.
Louisiana Dist. Attys.' Assn. filed an Amicus Curiae brief in support of State's application for rehearing.
DENNIS, Justice.
Defendant Gilmore was convicted of manslaughter, a violation of La.R.S. 14:31, and sentenced to serve twelve years at hard labor. On appeal, he relies on seven assignments of error for reversal of his conviction and sentence. After an examination of the entire record, we find that one of the errors complained of resulted in a probable miscarriage of justice, requiring reversal of defendant's conviction.
In the early mornings hours of September 29, 1973 a small group, including Lennie Washington and his brother Noel Washington, congregated outside the Aquarius Bar on Desire Street in New Orleans. The State produced evidence to the effect that Kenneth Sparks and the defendant, Edward Gilmore, had approached and an argument had ensued between Sparks and Noel Washington. Sparks produced a gun over which these two men began to struggle. Lennie Washington intervened on his brother's behalf and was shot. Several witnesses called by the State testified that the defendant Gilmore had fired the fatal shot with a second weapon which he had in his possession. However, it was the theory of the defense that Kenneth Sparks had shot the victim, and it offered the testimony of one witness who claimed Sparks confessed to the crime while hiding in her apartment after the shooting.
Motion for a New Trial
Defendant moved for a new trial on the basis of newly discovered evidence.
La.C.Cr.P. art. 851 provides:
"The court, on motion of the defendant, shall grant a new trial whenever:
"* * *
"(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty;
"* * *"
At the hearing on the motion the defendant produced the testimony of three new witnesses. The trial judge denied the motion primarily upon the ground that part of the evidence would be inadmissible at a new trial and secondarily for the reason that defendant had not exercised reasonable diligence in its discovery. We are compelled to conclude that our trial brother fell into error in both conclusions.
Essie Rodgers, who worked at the Aquarius Bar as a barmaid on the night of the shooting, testified that she saw Sparks fight with and shoot Lennie Washington. She further testified that one of the State's witnesses who named the defendant as the killer at the trial was not even present during the fracas. She also stated that she had not seen the defendant Gilmore at the Aquarius on the night of the shooting.
James Lewis, the owner of the Aquarius, testified that Sparks and Lennie Washington had an argument in the bar the day before the shooting. On the day after the crime, Lewis testified, Sparks had admitted to him that it was he who killed Washington. Lewis was absent from the bar during the time of the shooting occurred and could not shed any additional light on the events.
Sylvester Marshall, a regular patron at the Aquarius, was present on the night in *792 question. He corroborated Essie Rodgers' testimony that one of the State's eyewitnesses had not been at the bar near the time of the shooting. Marshall testified that an argument had occurred in the bar between Kenneth Sparks and Noel and Lennie Washington only a few minutes before the shooting occurred outside. However, he did not go outside until after Washington had been shot. He stated that he knew Gilmore and had not seen him at the scene of the crime.
The trial judge characterized the admission of guilt by Sparks to Lewis as inadmissible hearsay which could not be introduced at a new trial. However, there was substantial evidence that Sparks had been struggling over a gun with the dead man moments before the fatal shot was fired. Furthermore, evidence that Sparks had also confessed the crime to someone other than Lewis was introduced at the trial without objection by the State. It was established at the hearing that Sparks himself had been killed shortly after making these confessions and would, consequently, be unavailable to testify. Therefore, we hold, under these circumstances, the statements which clearly were against Sparks' penal interest would be admissible as an exception to the hearsay rule.
Some previous discussion of this issue is found in our opinion in State v. Morrow, 260 La. 72, 255 So.2d 78 (1971). Although Justice Summers, in his dissenting opinion, urged the recognition of such an exception to the hearsay rule, the majority left the question unanswered, finding that it had not been squarely presented by the facts.
Although there is authority to the contrary, Donnelly v. United States, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820 (1913), we think better reasons for admitting such evidence have been advanced by Justice Summers and by other jurists and scholars. In Donnelly, Justice Holmes, in dissenting from the exclusion of the confession by a deceased person, stated:
"The confession of Joe Dick, since deceased, that he committed the murder for which the plaintiff in error was tried, coupled with circumstances pointing to its truth, would have a very strong tendency to make anyone outside of a court of justice believe that Donnelly did not commit the crime. I say this, of course, on the supposition that it should be proved that the confession really was made, and that there was no ground for connecting Donnelly with Dick. The rules of evidence in the main are based on experience, logic, and common sense, less hampered by history than some parts of the substantive law. There is no decision by this court against the admissibility of such a confession; the English cases since the separation of the two countries do not bind us; the exception to the hearsay rule in the case of declarations against interest is well known; no other statement is so much against interest as a confession of murder; it is far more calculated to convince than dying declarations, which would be let in to hang a man (Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917); and when we surround the accused with so many safeguards, some of which seem to me excessive; I think we ought to give him the benefit of a fact that, if proved, commonly would have such weight. The history of the law and the arguments against the English doctrine are so well and fully stated by Mr. Wigmore that there is no need to set them forth at greater length. 2 Wigmore, Ev. §§ 1476, 1477." 228 U.S. at 277, 33 S.Ct. at 461, 57 L.Ed, at 834.
Wigmore has headed the criticism of the exclusion of statements of fact against penal interest:
"* * * it is plain enough that this limitation, besides being a fairly modern novelty of judicial invention, is inconsistent with the broad language originally employed in stating the reason and principle of the present exception (§§ *793 1457 and 1476 supra) as well as with the settled principle upon which confessions are received (§ 1475 supra).

"But, furthermore, it cannot be justified on grounds of policy. The only plausible reason of policy that has ever been advanced for such a limitation is the possibility of procuring fabricated testimony to such an admission if oral. This is the ancient rusty weapon that has always been brandished to oppose any reform in the rules of evidence, viz., the argument of danger of abuse. This would be a good argument against admitting any witnesses at all, for it is notorious that some witnesses will lie and that it is difficult to avoid being deceived by their lies. The truth is that any rule which hampers and honest man in exonerating himself is a bad rule, even if it also hampers a villain in falsely passing for an innocent.
"The only practical consequences of this unreasoning limitation are shocking to the sense of justice; for in its commonest application it requires, in a criminal trial, the rejection of a confession, however well authenticated, of a person deceased or insane or fled from the jurisdiction (and therefore quite unavailable) who has avowed himself to be the true culprit. The absurdity and wrong of rejecting indiscriminately all such evidence is patent.
"* * *.
"In the United States today, hesitation to admit such evidence is lessening. That we are now in the process of retracing our steps and discarding that barbarous doctrine of earlier times is evident not only in the increasing number of contemporary decisions but also in current statutes and rules directed to this end." 5 Wigmore, Evidence, § 1477 (Chadbourn rev. 1974). (Footnotes omitted.)
See also McCormick on Evidence, § 278 (2d ed. 1972).
The district judge also indicated that the exercise of reasonable diligence by defense counsel would have uncovered the witnesses before trial. Essie Rodgers testified that she had withheld her information because she "didn't want to be involved in it." Marshall was merely one of a crowd of customers present in the bar on the night of the shooting. James Lewis was the owner of the bar but was not present at the time of the shooting.
Had the defendant been represented by retained counsel perhaps we would expect the kind of diligent investigation for evidence which would have resulted in the earlier tracking down of these witnesses. However, the defendant here, who was incarcerated from the time of his arrest until trial, was provided a defense by court appointed counsel through the Orleans Indigent Defender Program. In light of its limited resources we are not prepared to say that it failed to exercise reasonable diligence in this case. However, even if it did, the defendant, as an indigent, should not be made to suffer because of a possible shortcoming of counsel provided by the court.
In his per curiam the trial judge stated that the testimony of the witnesses on the motion for a new trial was cumulative and would not have altered the jury's verdict. If he had not been under the impression that the confession of Sparks constituted inadmissible hearsay he may not have reached this conclusion. In any event, we disagree because it is very apparent that the testimony of the witnesses at the hearing was material and controverted much of the State's evidence upon trial. Given the peculiar facts of this case in which it was proven beyond any doubt that Sparks was struggling over a gun with the victim's brother moments before the victim intervened and was shot, evidence that a witness saw Sparks commit the killing and that Sparks twice confessed the crime to others, in our opinion, would probably have changed the verdict of the *794 jury. When considered in this light, we believe that defendant's showing, in the interest of fairness and justice, warranted the granting of a new trial and that the trial judge's failure to do so amounted to an error of law. La.C.Cr.P. art. 858; State v. Randolph, 275 So.2d 174 (La.1973); State v. Williams, 258 La. 251, 246 So.2d 4 (1971).
Two other points raised, on appeal deserve mention in order to avoid confusion upon the retrial of the case.
The Amended Indictment
On December 13, 1973, defendant was indicted by the Orleans Parish Grand Jury for first degree murder. On January 24, 1974, more than four months before trial, as assistant district attorney in open court amended the indictment to charge defendant with second degree murder. Defendant strenuously objects to the amending procedure and to the fact that he was thereby deprived of what he terms "a vested right to a unanimous jury verdict."
Defendant concedes that without amending the indictment the State could have abandoned the charge of murder in the first degree and proceeded to trial on the lesser charge of murder in the second degree. La.C.Cr.P. art. 61; State v. Doucet, 177 La. 63, 147 So. 500 (1933); State v. Edwards, 287 So.2d 518 (La.1973). In State v. Doucet, supra, the accused was charged with murder but the State abandoned that charge and elected to go to trial on the charge of manslaughter. This Court approved the procedure, saying:
"* * * The charge of manslaughter is included in that of murder, being a crime of the same generic, class as murder, but one of a lesser degree. In such cases the state may abandon the charge of the greater crime and proceed with the prosecution of the lesser, and no formal amendment of the indictment is necessary for that purpose. A motion in open court in the presence of the accused and entered on the minutes prior to the beginning of the trial is sufficient. State v. Bourgeois, 158 La. 713, 104 So. 627. State v. Kelly, 176 La. 405, 146 So. 6." 147 So. at 501.
Likewise, the charge of murder in the second degree is a charge of the same generic class as murder in the first degree, although it is a lesser grade of the offense. A verdict of guilty of second degree murder is responsive to the charge of first degree murder. La.C.Cr.P. art. 814, as amended by Acts 1973. Under these circumstances, a motion to proceed on the reduced charge made in open court in the presence of the accused and entered on the minutes would have been sufficient to amend the indictment. We perceive no substantial difference in the procedure followed by the district attorney in this case and think it would be inconsistent to hold that he could not accomplish formally what could have been done without formality. We therefore conclude that the district attorney was inherently empowered to amend the indictment to charge a lesser included offense, although there was no specific codal authorization for this procedure.
The amendment of the indictment also effected a change in the number of jurors required to concur in a verdict. Defendant would have us hold that the grand jury vested in him the right to a unanimous jury verdict by indicting him for first degree murder. He relies upon Article 7, Section 41 of the La.Constitution of 1921 (then in effect) and Article 782 of the La.Code of Criminal Procedure, which provide that cases in which the punishment may be capital shall be tried by a jury of twelve jurors, all of whom must concur to render a verdict. These provisions do not compel the result urged by defendant. Although the number of jurors to try a case is determined by the gravity or nature of the crime charged, State v. Stanford, 204 La. 439, 15 So.2d 817, 820 (1943), an indictment will not unalterably fix the composition of the jury. The controlling *795 provisions graduate the number of jurors composing the jury and the number which must concur in the verdict according to the severity of the punishment which might attend a conviction. We think it clear, then, that the charge under which an accused is prosecuted is the determining factor. See State v. Doucet, supra.
When the district attorney amended the indictment in this case he not only lessened the gravity of the charge but also eliminated the possibility that the punishment might be capital. We therefore find that a unanimous verdict would not be required on retrial of this case.
The Photograph of the Victim
The State offered into evidence a photograph of the victim taken at the morgue for the avowed purpose of identifying him. In an admitted attempt to exclude the photograph, defense counsel offered to stipulate that Lennie Washington was the man who had been shot on September 29, 1973, and was the subject of the photograph and the autopsy. However, the State refused to accept the stipulation and insisted that the photograph be shown to the jury. Defense counsel claimed that since he had stipulated to the facts which the State sought to prove through the photograph it had no probative value whatsoever and could only serve to inflame the emotions of the jurors.
The test of admissibility of a so-called "gruesome photograph" is whether its probative value outweighs its probable inflammatory effect. State v. Smith, 327 So.2d 355 (La.1976). Here, the photograph was relevant to prove the identity of the victim. The individual who identified the victim at the morgue as Lennie Washington was not available for testimony at trial. Therefore, it was necessary for the State to have the Assistant Coroner identify the body in the picture as that same individual upon whom he performed an autopsy and to have a witness identify the picture as that of the victim, Lennie Washington.
The photograph, while unpleasant, is not especially gruesome. It depicts the upper half of the victim's body, with a clean wound at the throat, some bandages in the abdominal region, and smudges of blood on his neck and the sheet beneath him. A similar photograph was examined in the Smith case, supra, and was found not to be of the sort which would overwhelm reason and excite the jury to condemn the accused without sufficient evidence. Thus, absent any stipulation by defendant the photograph would clearly be admissible.
The remaining question, then, is whether defendant's stipulation as to the identity of the victim could prevent the State from placing the photograph in evidence. As a general proposition, no party is required to stipulate with his adversary and may insist upon proving the facts of his case. Parr v. United States, 255 F.2d 86 (5th Cir. 1958), cert, den., 358 U.S. 824, 79 S.Ct. 40, 3 L.Ed.2d 64. See also State v. Ridcau, 249 La. 1111, 193 So.2d 264 (1967). However, the danger of abuse where material objects, e.g., morgue photographs, bloody clothing, and weapons, are exhibited to the jury warrants some qualification of this rule.
Wigmore has recognized a twofold threat in the production of such evidence:
"First, there is a natural tendency to infer from the mere production of any material object, and without further evidence, the truth of all that is predicated of it. Secondly, the sight of deadly weapons or of cruel injuries tends to overwhelm reason and to associate the accused with the atrocity without sufficient evidence." 4 Wigmore, Evidence, § 1157 (Chadbourn rev. ed. 1972).
But as noted above, the inflammatory effect of such evidence must be weighed against its probative value, and generally the possibility of prejudice will not be permitted *796 to thwart the State's necessary attempts to prove the method and results of the crime. However, where the State's proof has been rendered unnecessary by defendant's judicial admission, the prejudicial nature of the evidence assumes added significance and correspondingly reduces the State's legitimate interest in its admission:
"A fact that is judicially admitted needs no evidence from the party benefitting by the admission.
"But his evidence, if he chooses to offer it, may even be excluded; first, because it is now as immaterial to the issues as though the pleadings had marked it out of the controversy (ante, § 2); next, because it may be superfluous and merely cumber the trial (ante, §§ 1863, 1904); and furthermore, because the added dramatic force which might sometimes be gained from the examination of a witness to the fact (a force, indeed, which the admission is often designed especially to obviate) is not a thing which the party can be said to be always entitled to." 9 Wigmore, Evidence, § 2591 (3d ed. 1940). (Footnote omitted.)
Particularly where, as here, the fact to be proved is not seriously at issue a judicial admission offers an expeditious means of serving both the State's interest in meeting its burden of proof and the defendant's interest in excluding prejudicial material. To reserve to the State the right to accept or reject the stipulation is to forego an objective balancing of these, countervailing interests and to invite the State to exploit the prejudicial impact of the evidence. This was demonstrated in the instant case. When the State asked: at trial that the photograph be shown to the jury, the judge remarked, "I don't see why the jury has to see the picture;" but at the State's insistence, he complied with the request. Implicit in the State's refusal to accept the stipulation is the suggestion that it sought to gain something more from the admission of the photograph than proof of the murder victim's identity. If this "something more" was merely the inflammatory effect of the photograph, the trial judge should have had the authority to prevent it.
On the other hand, a defendant may not be permitted to rob the State's evidence of its fair and legitimate weight by means of a unilateral stipulation:
"Nevertheless, a colorless admission by the opponent may sometimes have the effect of depriving the party of the legitimate moral force of his evidence; furthermore, a judicial admission may be cleverly made with grudging limitations or evasions or insinuations (especially in criminal cases), so as to be technically but not practically a waiver of proof." Id.

The sensible solution, offered by Wigmore, is to leave the question of admissibility to the trial judge:
"* * * Hence, there should be no absolute rule on the subject; and the trial Court's discretion should determine whether a particular admission is so plenary as to render the first party's evidence wholly needless under the circumstances." Id.

Therefore, when the case is tried again, it will be for the trial judge to determine whether a stipulation may prevent the admission of the photograph into evidence.
For the reasons assigned, the conviction and sentence of the defendant are set aside, and the case is remanded for a new trial according to law.
Remanded for a new trial.
SANDERS, C.J., dissents.