337 So.2d 1041 (1976)
STATE of Louisiana
v.
Eugene REDWINE.
No. 57919.
Supreme Court of Louisiana.
October 6, 1976.
*1042 Teddy W. Airhart, Jr., Airhart & Copenhaver, Baton Rouge, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie B. Brown, Dist. Atty., Lennie F. Perez, Asst. Dist. Atty., for plaintiff-appellee.
DENNIS, Justice.
Defendant, Eugene Redwine, was charged by bill of information, tried, and convicted for his participation in the armed robbery of H. Alva Brumfield on May 25, 1973. La.R.S. 14:64. The robbery resulted in Mr. Brumfield's death; Redwine, however, was not tried for murder, but for armed robbery. Upon his conviction the trial judge sentenced Redwine to serve ninety-nine years at hard labor without eligibility for parole, probation or suspension of sentence.
Defendant appeals his conviction and sentence relying on four assignments of error.
ASSIGNMENT OF ERROR NO. 1
Defendant urges that the trial court improperly admitted, over timely objection, four 5" × 7" color photographs taken at the scene of the alleged robbery depicting the dead body of the robbery victim. Defendant contends that these photographs were inflammatory and of insufficient probative value to counterbalance their prejudicial effect, and that their admission deprived him of a fair trial.
The State offered into evidence some thirty-three photographs taken at the scene of the crime. Defendant objected to the introduction of eleven of the photographs. The trial judge sustained defendant's objections to seven of the photographs and overruled his objections to the four photographs which underlie his first assignment of error.
*1043 The undisputed and often cited test for determining whether an alleged "gruesome" photograph is admissible is whether its probative value outweighs its possible prejudicial effect upon the jury. State v. Cooper, 334 So.2d 211 (La.1976); State v. Smith, 327 So.2d 355 (La.1976); State v. Beach, 320 So.2d 142 (La.1975); State v. Curry, 292 So.2d 212 (La.1974). As the cited cases also make clear, a photograph, as any other evidence, must be relevant to a material issue before the court. See also, La.R.S. 15:435.
In State v. Scott, 337 So.2d 1087 (La. 1976), No. 57,630, this Court affirmed defendant's conviction where his claim for reversal was based on the State's introduction of a gruesome photograph alleged to have no relevance to a material issue in the case. The opinion in that case appears to disregard the well accepted test that admissibility of gruesome photographs is contingent on their probative value outweighing their prejudicial effect in favor of a more relaxed test of "whether the photographs were so outrageous as to necessitate that a new trial be conducted without them," but a majority of this Court, though concurring in the result reached, did not agree with the language used in the opinion. We now reaffirm the test that admissibility of allegedly gruesome photographs requires weighing their probative value as to a material issue in the case against the likelihood of prejudice which may result from their submission to the jury. As we said in State v. Smith, supra,
"* * * We realize that making this determination involves weighing two elusive concepts * * * the prosecutor would do well to avoid flirtation with reversible error. * * *" 327 So.2d at 362.
Redwine was prosecuted for armed robbery. To obtain a conviction for this offense, the prosecution must prove beyond a reasonable doubt that the accused committed a theft of something of value from the person of another or in another's immediate control by use of force or intimidation, and while armed with a dangerous weapon La.R.S. 14:64. Thus, evidence tending to establish the use of force on the person of the victim or that the assailant was armed with a dangerous weapon was relevant to a material issue in the State's case.
The photographs objected to by the defendant herein showed the robbery victim's fully clothed body lying on the floor with his hands tied behind his back, and his feet tied together. Although they revealed traces of blood about the victim's head and neck, on the floor, and on the pillow used by the assailant to muffle the gunshot, and although they were clearly unpleasant, as we found in State v. Smith, supra, the photographs complained of were not "* * * so gruesome as to `overwhelm reason' and cause a jury to lose sight of the need for the prosecutor to establish with sufficient independent evidence the guilt of the accused. * * *"
Defendant, at the time these photographs were admitted, and again before this Court, complained that other evidence offered by the State was sufficient to establish the requisite use of force by the defendant in the commission of the robbery so that the admission of these photographs was cumulative, and lacked sufficient probative value to outweigh their prejudicial effect upon the jury. However, we cannot say that the evidence did not supply proof essential to the State's case. In discussing a similar issue in State v. Smith, supra, we stated:
"* * * Inasmuch as the indictment charged defendant with the murder of one Stephen Brubaker, it was at least appropriate, and possibly necessary, for the state to establish that it was Stephen Brubaker who was the victim of this murder. It is not proper for us to conclude that the identification of Stephen Brubaker by his father was unnecessary because a police patrolman had already testified that he viewed the victim at the scene of the crime and recognized him as a young employee of the Burger King known to him as `Steve.' Under any conditions, the father's identification of the victim as his son Stephen Brubaker *1044 was `probative.' Furthermore, it is inappropriate for us now to determine that the identification was or was not absolutely essential to the state's case. In any event we find that this identification was not merely cumulative." 327 So.2d at 361-62.
We further observe that at the time the photographs objected to by defendant were offered into evidence, and while the objection was being argued, the defendant did not offer to stipulate to the facts the State was attempting to prove by their introduction. Thus, our recent ruling in State v. Gilmore, 332 So.2d 789 (La.1976), is inapplicable in this case. In Gilmore we determined that the trial judge has discretion to exclude unpleasant photographs although their probative value outweighs their potentially inflammatory effect when the defendant offers to stipulate fully to the facts which the State ostensibly desires to prove by their introduction. This measure of discretion is distinct from and additional to that vested in the trial judge in determining whether the probative value of offered photographs outweighs their possible prejudicial effect, e.g., State v. Nix, 327 So.2d 301 (La.1976); State v. Larue, 324 So.2d 384 (La.1976), and arises only when there is an offer to stipulate by the defendant. State v. Gilmore, supra.
In comparing the value of the photographs in proving the use of force with the minimal likelihood that the jury could have been inflamed by them, we find that the probative value of the photographs outweighed their possible inflammatory effect. Consequently we find no error in the trial judge's ruling admitting these photographs. Defendant's first assignment of error therefore lacks merit.
ASSIGNMENT OF ERROR NO. 2
Error is alleged in the trial court's ruling allowing Dr. Carl Tucker, a pathologist, to testify to his findings upon examination of the body of the victim. Defendant urges that because this testimony dealt solely with the medical reasons for the death of the victim, it was irrelevant to the armed robbery prosecution, and highly prejudicial to him.
The doctor's testimony tended to prove that force was used upon the person of the victim, and La.R.S. 14:64 undoubtedly makes the use of force a material issue in an armed robbery prosecution. Once evidence is determined to be relevant, however, the question of its admissibility is not finally resolved. As Professor McCormick observed,
"* * * There may remain the question, is its value worth what it costs? There are several counterbalancing factors which may move the court to exclude relevant, evidence if they outweigh its probative value. In order of their importance, they are these. First, the danger that the facts offered may unduly arouse the jury's emotions of prejudice, hostility or sympathy. Second, the probability that the proof and the answering evidence that it provokes may create a side issue that will unduly distract the jury from the main issues. Third, the likelihood that the evidence offered and the counter proof will consume an undue amount of time. Fourth, the danger of unfair surprise to the opponent when, having no reasonable ground to anticipate this development of the proof, he would be unprepared to meet it. Often, of course, several of these dangers such as distraction and time consumption, or prejudice and surprise, emerge from a particular offer of evidence. This balancing of intangiblesprobative values against probative dangersis so much a matter where wise judges in particular situations may differ that a leeway of discretion is generally recognized. * * *" McCormick on Evidence, 438-40, § 185 (Cleary ed. 1972) (footnotes omitted).
In accordance with this view, we have held that the trial judge must not only determine that evidence is relevant to a material issue, but also that it is not unduly prejudicial. State v. Foss, 310 So.2d 573 (La.1975); State v. Bradford, 298 So.2d 781 (La.1974); State v. Moore, 278 So.2d 781 (La.1973).
*1045 The State argues that Dr. Tucker's testimony was "a totally dispassionate and scientific description of the victim's wounds." We agree. The doctor's testimony tended to establish the use of force on the victim of the alleged robbery, but it does not appear to be of such character as would unduly inflame or arouse the jury.
Defendant further objects to the trial court's admission of this testimony because "[m]any witnesses testified that force was used * * * to rob the victim." The State concedes that Dr. Tucker's testimony was corroborative of other evidence of force. The mere fact that evidence may be cumulative does not make it inadmissible.
We do not find in this case that the doctor's testimony was so inflammatory as to be unduly prejudicial, that it distracted the jury from the main issues in the trial, that it consumed an inordinate amount of time, or that it created unfair surprise to the defendant interfering with his ability to make a defense. See McCormick on Evidence, 438-40, § 185 (Cleary ed. 1972); Trautman, Logical or Legal RelevancyA Conflict in Theory, 5 Vand.L.Rev. 385, 392-98 (1952).
We thus find no merit in defendant's second assignment of error.
ASSIGNMENT OF ERROR NO. 3
In its case in chief, the State, in order to prove defendant's participation in the crime charged, relied primarily on the testimony of Dale Bourland and Connie Dotson, two accomplices in the alleged crime. Each had been promised some degree of leniency in exchange for their cooperation, and thus their testimony was subject to attack. According to their testimony, Redwine, Bourland, Dotson, Bela Andrasi and Tom Jones were in the process of burglarizing Mr. Brumfield's house when he returned unexpectedly and was robbed and shot to death by Redwine.
Joseph Siegel, called by the defense, testified that he, Bourland, Dotson, Andrasi and an individual alternatively referred to as Tom Jones and "Mr. X" were all of the participants in the crime. He said Redwine was not in any way involved in the robbery and murder. He specifically denied Redwine's presence among the accomplices before, during, and after the offense; he testified Bourland accompanied him several days before the robbery to the Brumfield residence to determine if it had a burglar alarm; he testified that he and Bourland entered the residence on the night of the offense, while lookout was kept by Jones outside of the house, and Dotson and Andrasi in an automobile parked nearby; he testified that while he and Bourland were in the house, Mr. Brumfield arrived, and that they handcuffed Mr. Brumfield and beat him; he testified that he mistakenly called out Bourland's name in Mr. Brumfield's presence, and that as a result Mr. Brumfield had to be killed; he testified that Bourland shot Mr. Brumfield.
In essence, Siegel related a story of the crime which coincided with that of the State's witnesses except that in Siegel's version he was present but Redwine was not and the victim was shot by Bourland, instead of Redwine.
Siegel also testified that on another occasion at Siegel's apartment Bourland told him "Redwine stabbed him [Bourland] in the arm" and that Bourland "was going to get even with Redwine and he mentioned that he would kill Redwine."
In the course of his direct examination Siegel was asked by defense whether he had "ever made any statement concerning this offense." Siegel admitted that he had and explained the circumstances under which the taped statement was made. Defense counsel then asked,
"Now, the statement that you gave previously, is it similar or is it different to the statement, the testimony here today?"
Siegel replied, "It's entirely different."
Almost immediately upon beginning its cross-examination of Siegel, the State moved to play in its entirety a tape recorded statement previously made by Siegel to the police. The trial judge removed the jury and proceeded to determine whether *1046 Siegel's prior inconsistent statement would be admitted. During the course of the State's cross-examination out of the presence of the jury, Siegel either evasively answered the State's questions or denied having made the statements attributed to him by the examiner. Siegel denied that he identified Redwine as a participant in the robbery; he denied that he identified Redwine and Bourland as the persons entering the Brumfield residence on the night of the robbery; he testified that he never said Redwine bragged about having shot Mr. Brumfield; he denied that he said it was Redwine who carried the murder weapon to the Brumfield residence on the night of the robbery; and he denied having told the police that Bourland inadvertently called out Redwine's name, and for that reason Redwine had to kill Mr. Brumfield.
After these specific denials and other evasive and non-responsive answers to the State's questions, the State renewed its request to play Siegel's prior statement to the jury. The trial judge, before ruling on the State's request, ordered that he hear the tape in its entirety. The tape was played in accordance with the judge's order. It disclosed the following:
Siegel denied his own participation in the crime. He stated Redwine was with the participants in the offense on the night of the crime; he identified the participants by name, including Bourland, Dotson, Andrasi, Jones, and Redwine; he claimed that he and Redwine, not Bourland, had gone to the Brumfield residence several days before the crime in order to see if it was equipped with a burglar alarm system; he told the police that he had heard that Redwine bragged about shooting Mr. Brumfield; he related that Bourland had inadvertently called out Redwine's name; and that Redwine shot Brumfield because he feared the victim could have identified him. The taped statement was, with regard to virtually every detail of the burglary-robbery-murder episode, contradictory to Siegel's testimony at trial. The tape also contained a segment relating to an incident in which Bourland threatened to kill a French poodle and was in turn threatened with death by Redwine if he did so. In another portion of the tape Siegel said that Redwine had once stabbed Bourland.
After hearing the tape, the trial judge ruled that it could be played in its entirety to the jury. Counsel for the defendant objected to this ruling on the ground that the statement was hearsay, that proper foundation for its admission had not been laid, and that its introduction was foreclosed by Siegel's acknowledgment that he had made a prior statement contradictory to his trial testimony. Nevertheless, the tape was played to the jury. The trial judge then instructed the jury that they should consider the tape in assessing the credibility of the witness but not in deciding the issue of Redwine's guilt or innocence.
The threshold question is whether Siegel's admission, in response to defense counsel's questions on direct examination, that he had made a prior statement that was "entirely different" from the testimony given by him at trial bars the State from impeaching his testimony and his credibility.
La.R.S. 15:486 provides:
"Each side has the right to impeach the testimony and the credibility of every witness sworn on behalf of the other side."
La.R.S. 15:493 provides:
"Whenever the credibility of a witness is to be impeached by proof of any statement made by him contradictory to his testimony, he must first be asked whether he has made such statement, and his attention must be called to the time, place and circumstances, and to the person to whom the alleged statement was made, in order that the witness may have an opportunity of explaining that which is prima facie contradictory. If the witness does not distinctly admit making such statement, evidence that he did make it is admissible."
Reading these provisions together, it is clear that the State is entitled to impeach the testimony and the credibility of a defense *1047 witness by the use of his prior inconsistent statement. The prior statement, however, is not itself admissible unless a proper foundation is laid, and the witness may prevent its introduction into evidence by distinctly admitting, in response to questions propounded by the impeaching party in accordance with La.R.S. 15:493, that he did in fact make such a statement. State v. Rudolph, 332 So.2d 806 (La.1976); State v. Evans, 317 So.2d 168 (La.1975); State v. Smith, 301 So.2d 594 (La.1974).
We have been unable to discover, however, any authority for the proposition that a party may protect his own witness from impeachment by eliciting from the witness during direct examination the mere admission that he had given a prior statement "entirely different" from his trial testimony. The right of each party to impeach the testimony and the credibility of his adversary's witnesses has been clearly established. La.R.S. 15:486. Perhaps by drawing a rather broad inference from La.R.S. 15:493 we could reach the conclusion that defense counsel's maneuver had erected a barrier to the State's devastating impeachment of Siegel. But to do so would overlook the origin and purpose of the statute. According to Dean Wigmore, the rule may be said to have had its birth in The Queen's Case, 2 Brod. & B. 284, 313 (1820) (s.c., 3 Queen Caroline's Trial 259 (Linn's ed.)), and the reason for it is to obviate unfair surprise by warning the witness a self-contradictory statement will be offered against him, allowing him to deny, explain or admit it. 3A Wigmore on Evidence, § 1025 (Chadbourn rev. 1970). The court in The Queen's Case declared that "[i]f the witness admits the words or declarations imputed to him, the proof on the other side becomes unnecessary * * *." Id. at 1021. We find nothing in our jurisprudence or in the wording of La.R.S. 15:493 to indicate that the legislature, by its enactment, sought to do more than adopt the rule of The Queen's Case. Therefore, we think that the statute should be construed narrowly and applied only in instances in which a party attempts to impeach an adverse witness or makes a genuine and proper effort to impeach his own witness.
Defense counsel's questioning of Siegel could hardly be termed a genuine or proper attempt at impeachment. There was no indication counsel had been surprised or dealt with hostilely by Siegel during direct examination. Therefore, he was not entitled to impeach his own witness. La.R.S. 15:487. Counsel's broad general inquiry whether Siegel's prior statement had been "different" or "similar" to his testimony did not question him on any assertion of fact but allowed him to answer unspecifically that it was "entirely different." This response amounted to little more than an opinion and did not constitute an admission of having made a prior inconsistent statement regarding any particular one of the many facts to which he had testified at trial; it told the trier of fact nothing of the nature or extent of his prior self-contradiction. Furthermore, under the circumstances of the instant case, Siegel's admission that he had once made an "entirely different" statement to the police, coming after he had confessed on the stand that he, Bourland, and others had committed the offense, probably enhanced rather than detracted from his credibility with the jury. Before the State introduced his prior statement the jury quite possibly could have drawn the inference that Siegel's "entirely different" statement amounted to nothing more than a complete denial of knowledge of any facts surrounding the crime. We are convinced that the jury was in a better position to assess Siegel's credibility by having access to his prior self-contradictory statement, that it was introduced after a proper predicate had been laid in which Siegel was given an opportunity to admit, deny or explain the facts therein, and that, if the trial court had allowed the defendant to insulate Siegel from proper impeachment by the State with such a broad, unspecific admission of self-contradiction, a serious miscarriage of justice could have resulted.
The remaining question presented by defendant's third assigned error is whether the trial court erred in admitting the entire *1048 tape recorded statement rather than selected portions of it, for which a proper foundation had been laid by the State. The tape, as we have observed, contained statements by Siegel to the effect that "bad blood" existed between Redwine and Bourland, that Redwine once stabbed Bourland, and that there was a dispute over a French poodle in which Redwine threatened to shoot Bourland.
Defendant complains that the judge erred in playing the entire tape recorded statement to the jury, because Siegel was not questioned about the portion of the taped statement relating to the "bad blood" between Redwine and Bourland. Thus he was not given an opportunity to admit, deny or explain it before the tape was played to the jury.
We do not find that the portion of the taped statement for which proper foundation was not laid is significantly contradictory to Siegel's trial testimony. That portion of the tape was not therefore a prior inconsistent statement and the foundation rules of La.R.S. 15:493 do not apply. At most the trial judge's admission of that portion of the tape amounted to admission of excludable hearsay evidence, and because the content of the taped statement did not differ significantly from Siegel's direct trial testimony, and because Siegel was available to be examined by the defendant through counsel on redirect examination, we cannot conclude that its admission constituted reversible error. La.C.Cr.P. art. 921.
For the reasons assigned, we find no merit in defendant's third assignment of error.
ASSIGNMENT OF ERROR NO. 4
Defendant submitted four special requested charges which the trial judge declined to include in his jury instructions. Defendant assigns error to the trial judge's ruling.
The following requested charge is illustrative of the character of them all:
"I instruct you that in weighing the evidence of any witness, you may consider the motive of that witness for testifying, including his motive in protecting himself from the consequences of his involvement in this crime. You have heard Dale Bourland testify that he has made an agreement with the Prosecutor to permit him to go on trial for Murder. I instruct you that if Dale Bourland is convicted of Murder or pleads `guilty' to the Murder of H. Alva Brumfield, Jr., then the minimum time that he would be required to serve would be ten years and six months from the date of his arrest. In contrast, if he were to go on trial or plead `Guilty' to Armed Robbery, he could be required to spend far longer in the State Penitentiary then ten and one-half years.

"If you consider that Dale Bourland has been promised that he would serve any penitentiary term outside of the State of Louisiana, I instruct you that is not the law of Louisiana and there is at this time no legal way that this could" be done in the case of Dale Bourland if he were convicted of or pleaded `guilty' to the Murder of H. Alva Brumfield, Jr." (Emphasis supplied.)
The italicized portions of this charge are objectionable. They call for the trial judge to comment on Dale Bourland's testimony and inaccurately to contrast the supposed "minimum time" of incarceration for a murder conviction with the "far longer" sentence for armed robbery. The effect of this undoubtedly would be to mislead the jury because the significance of the ten year and six month "minimum time" of incarceration said to apply to a murder conviction is not explained in the proposed instruction. In sum, defendant's requested charges are inaccurate, misleading, and contain judicial comment on the evidence prohibited by La.C.Cr.P. art. 806.
Furthermore, a requested special charge need not be given if it is included in the general charge or in another special charge to be given. La.C.Cr.P. art. 807. The trial judge's general instructions in this case sufficiently covered the question of witness credibility. The jury heard Ms. Dotson and Mr. Bourland admit to having entered into plea bargains with the State.
*1049 The jury was told expressly that it could consider a witness's motive in giving testimony, and his possible relationship to either side of the case.
The trial judge did not err in refusing to give defendant's special requested instructions; there is no merit in defendant's fourth assignment of error.
For the foregoing reasons we affirm defendant's conviction and sentence.