464 So.2d 268 (1985)
STATE of Louisiana
v.
David RUSHING.
No. 84-KA-0991.
Supreme Court of Louisiana.
January 14, 1985.
Rehearing Denied March 14, 1985.
*270 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Marion B. Farmer, Dist. Atty., David R. Paddison, Thomas W. Mull, Asst. Dist. Attys., for plaintiff-appellee.
John R. Simmons, Dwight Doskey, John Craft, Craft & Doskey, New Orleans, for defendant-appellant.
BLANCHE, Justice.
Defendant, David Rushing, Jr. was indicted by the St. Tammany Parish Grand Jury on April 21, 1983 for the first degree murder of Danny Archer, a violation of La.R.S. 14:30. A jury of twelve unanimously found the defendant guilty of the crime charged. Following the sentencing hearing, the jury recommended unanimously that the defendant be put to death, and the trial court sentenced him accordingly. In reaching its conclusion, the jury found the existence of two statutory aggravating circumstances: (1) the defendant had been engaged in the perpetration or attempted perpetration of an armed robbery or simple robbery at the time the victim was killed, and (2) the offense was committed in an especially heinous, atrocious, or cruel manner. La.C.Cr.P. art. 905.4 §§ (a) and (g).
In appealing his conviction and sentence, the defendant has assigned seven errors.[1] In this opinion we will treat three assignments *271 of error (Assignments 5, 6 and 7) and review the sentence. The defendant's remaining assignments involve legal issues governed by established principles of law and will be treated in an unpublished appendix which will comprise part of the official record in this case. Our review will show that none of the assignments warrant reversal and we will therefore affirm the conviction and sentence.

FACTS
Between 3:30 and 4:00 a.m. on April 1, 1983, Lloyd Jackson, a route salesman, had completed his deliveries and was driving home when he discovered a cab stopped beside the road with its motor running, lights on, doors shut and its windows rolled up. Jackson found Danny Archer behind the steering wheel leaning over to the passenger side covered with blood. Jackson went to a nearby house and called the police.
When the police arrived on the scene, they found that Archer had been shot in the back and that he had been repeatedly struck on the top of the head. The interior of the car was covered with blood. There was so much blood splattered about the car that the investigating officers initially believed that more than one victim had been killed. The police found a single expended shotgun shell three feet from the cab driver's door. A blood saturated black glove was discovered in the door jam on the driver's side of the car. On the floorboard near the gas pedal, the officers found a portion of a broken wooden gun stock. About 80 feet behind the cab, the officers found a wallet which contained Jeffrey Fussell's driver's license.
This evidence led the officers to Jeffrey Fussell's trailer. Fussell who had been asleep on the couch near the door invited the officers inside where they discovered David Rushing asleep in one of the rooms. On the floor near Rushing's bed, there were thongs, jeans and a black jacket covered with blood stains. When Rushing was awakened, the officers found that his feet were covered with blood. No blood was found on Fussell.
Both men were placed under arrest and a short time later, Fussell[2] led the officers to the place where the shotgun which had been used to kill Archer had been discarded. Approximately 5 hours later, David Rushing voluntarily gave a statement to the officers describing the events leading up to the murder of Danny Archer.
In this confession Rushing stated that he and Fussell had taken blue Valiums earlier in the evening and had decided to go to Slidell to rob a gas station. When they found the gas station was closed, they decided to call a cab and rob the driver. In discussing who would actually rob the cab driver, Rushing stated that Fussell had told him that he had the nerve to pull the "cap" (the trigger). However, Rushing related that he then decided he would do it because "I didn't figure I had the nerve."
Rushing stated that he was wearing thongs, jeans, black gloves and Fussell's jacket when he entered the cab and that he had a sawed-off shotgun hidden under his clothing. Rushing told Archer to drive to the Ponderosa Subdivision and Fussell followed in Rushing's car. Rushing stated that at some point along the way he thought Archer was reaching for a gun under the seat. Rushing placed the shotgun to the back of the driver's seat and shot Archer in the right side of the lower back. Rushing stated that Archer then turned around and began swinging at him. Although he denied hitting Archer with the shotgun, Rushing admitted he fought to keep Archer off of him. Thereafter, Fussell who had driven up behind the cab, picked up Rushing and drove away from the murder scene.
At trial, the defendant took the stand and recanted his confession. He claimed that at the time of the murder and confession he was intoxicated from taking barbituates and only remembered portions of *272 the evening. Rushing testified that he bought drugs from Leslie Sheridan on the afternoon of March 31, 1983.[3] At approximately 8:00 p.m., Rushing and Fussell drove to the parking lot of the Charter Oak Church in Pearl River. Fussell melted down the drugs and injected them into Rushing's arm. It was then that they decided to drive to Slidell and rob a gas station. To support this testimony the defendant called Nancy Cooper, a newspaper carrier, who testified that she discovered the two men stranded in a ditch about 3:30 a.m. which would have been about an hour after the murder. She stated that she conversed with both men and described them as "feeling good" which she had interpreted to be a sign of alcohol intoxication.
The State introduced the results of tests on a blood sample taken from the defendant at 8:25 a.m. on the morning of the murder which indicated that only trace amounts of Valium were present in his blood. Pathologist Charles Crumpler testified that these trace findings precluded the possibility of any big "fix" of Valium the evening before and ruled out the possibility that the defendant was so intoxicated by the Valium that he could not have formulated the specific intent to murder Archer.
The State presented testimony of a police officer who had stopped the two men about two hours before the murder to tell them the car's brake lights were out. The officer testified that Rushing did not appear to be intoxicated. The State also called Officer Phil Singletary who related that he had seen the defendant at the Oasis Lounge at approximately 3:45 a.m. when he was conducting a bar check. He exchanged greetings with Rushing at that time and stated that Rushing did not appear to be intoxicated.
Scientific tests were performed on the defendant's clothes and on the swabbings taken from the blood on the defendant's feet and each item contained blood of the same type as the victim's. The tests also established that the victim was repeatedly struck on top of the head with the butt of a shotgun as the hairs and blood found embeded in the shotgun were identical to the victim and the broken wooden piece found on the floorboard of the cab fit the end of the shotgun in question. The pathologist who conducted the victim's autopsy testified that the shotgun blast had entered the lower portion of Archer's abdominal cavity, collapsed his lung and perforated his liver. He also found five lacerations from 1½ inches to 3 inches in length, on the rear portion of his head. Three of the blows fractured Archer's skull.[4] He stated that absent the blows to the head, the victim would have bled to death in no more than 45 minutes.

Assignment of Error No. 5
The defendant contends that the trial court erred in excluding the testimony of Deputy Sheriff John Cousin, a jailer, concerning a statement made to him by Jeffrey Fussell exculpating the defendant. The defendant argued at trial that Fussell had been the party in the cab and that he had independently decided to kill Archer. Outside the presence of the jury, the defense counsel called Fussell to the stand, but Fussell asserted his 5th Amendment privilege.
Deputy Cousin was called to the stand and the following proffer of his testimony was made. Deputy Cousin was working the graveyard shift a few days before Rushing's trial. He testified that Fussell had summoned him to Fussell's cell complaining of pangs of conscience about Rushing's prospects in court. The deputy testified that the conversation went as follows:
"Sarge, could I talk to you?" And I said, "What you want to talk about, *273 man? Why you not sleeping?" And he told me, "My conscience is eating me up." And I said, "What do you mean, your conscience is eating you up?" He said, "I keep thinking about David Rushing." He said, "The poor boy is going to spend the rest of his left in jail for something he didn't do." He said, "He just was with me. He didn't know what I was going to do."
Rushing acknowledges that Fussell's statement does not completely exculpate him, however, he asserts that the statement was crucial to his defense because if believed by the jury, the defendant would only be guilty of second degree murder.
The district judge ruled that Cousin's statement was inadmissible hearsay:
"Counselors, there are a number of exceptions to the hearsay rule. This testimony is clearly hearsay. And one of the exceptions is a declaration against interest by a nonparty.
Having heard the testimony of Sergeant Cousin, it's clear that this testimony, or this statement was made by a third party, namely, Fussell. It was also clearly against his penal interest.
The third requirement, insofar as the exception to the hearsay rule of a declaration against interest, is that the declarant is unavailable. In this particular situation, the declarant is present. It's not a matter of where he is unavailable. On the other hand, the declarant has exercised his constitutional privilege against self-incrimination. The sole purpose for exceptions to the hearsay rule is grounded on the fact that there is a substantial amount of reliability at the very bedrock or foundation of these exceptions.
Gentlemen, we have a situation before us today that is subject to charades, games, shams, and I am convinced that this is exactly what we have in this particular case. We have two defendants. They're scrambling like squirrels. I find that this testimony insofar as its probative value in the trial of this particular case is totally, completely unreliable. For that purpose, together with the purpose that the declarant is, in fact, available but has exercised his constitutional privilege against self-incrimination, the Court will not permit this testimony to be presented to the jury."
This court recognized a declaration against penal interest as an exception to the hearsay rule in State v. Gilmore, 332 So.2d 789 (La.1976). Gilmore, supra, indicated that a declaration against penal interest is an exception to the hearsay rule when the defendant is unavailable at trial and when there is additional evidence indicating that the declarant's statement is reliable. In that case, Gilmore tried to exculpate himself by proving that a man named Sparks, had committed the crime. Sparks died shortly after confessing his guilt to a third party. In addition to the hearsay testimony of the third party, the State introduced substantial evidence that Sparks had been in a struggle over a gun with the victim moments before the fatal shot was fired. This court held that under these circumstances the statements made to the third party were admissible.
In Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038 (1973) the defendant was arrested for a murder committed by a person named McDonald. McDonald had confessed to several close acquaintances claiming credit for the murder for which the defendant was on trial. The U.S. Supreme Court held that McDonald's hearsay statements should not have been excluded from Chamber's trial because there were substantial assurances of their trustworthiness. McDonald's oral confessions were made spontaneously a short time after the murder and were corroborated by eyewitness testimony. McDonald also had made a sworn written confession. Each confession was truly incriminatory and clearly against the third party's penal interest.
Fussell's out-of-court statement had no such characteristics which assured its reliability. Fussell made the statement to the jailer only a few days before Rushing's trial. Fussell's statement that Rushing did not know what Fussell was going to do is not truly self-incriminating and is not *274 unquestionably against Fussell's own interest. The source of credibility for the outof-court statement against the defendant's penal interest is the assumption that a person would not normally admit to the commission of a crime if not true. Unless the statement in question is truly against Fussell's penal interest, it is reliability is suspect. The statement in question is ambiguous. Fussell did not confess to committing the murder nor did he indicate whether Rushing was unaware that Fussell planned to commit a robbery that evening or whether Rushing was unaware that Fussell planned to kill the cab driver. The statement also does not say that Rushing did not commit the murder.
Rushing claims that Fussell's statement to the jailer meant that Fussell, not Rushing, was the triggerman in the murder. While the statement in question may be read in that manner, there is no evidence corroborating such an interpretation. The defendant argues that there is evidence that Fussell committed the murder because it was Fussell's jacket that was covered with blood and it was Fussell's wallet found 80 feet behind the cab. We find this argument to be unpersuasive. Less than five hours after the murder, Rushing confessed that he was wearing Fussell's jacket when he committed the murder of Archer. The jacket, along with jeans and thongs all covered with the victim's blood were found near the defendant's bed only hours after the murder. There is no evidence indicating that Fussell killed Archer, but there is substantial evidence to support the finding that Rushing was the triggerman.
The reliability of Fussell's statement is suspect as it may be interpreted in different ways. It is not clearly against Fussell's penal interest and there is no evidence corroborating the interpretation that Rushing seeks to give it. The trial court's finding that Fussell's statement to Cousins lacked sufficient indicia of reliability was correct and the testimony was properly excluded. This assignment lacks merit.
Our review of this case shows that all of the assignments of error are without merit. For the reasons assigned above, the conviction should be affirmed.

Sentence Review
The defendant was tried in accordance with the provisions of La.C.Cr.P. arts. 905-905.8, which provide for a bifurcated trial in capital cases. At the conclusion of the sentencing hearing, the 12-man jury returned a unanimous recommendation that the defendant be sentenced to death.
La.C.Cr.P. art. 905.9 requires this Court to review every sentence of death to determine if it is excessive. In reviewing capital sentences, we are guided by Supreme Court Rule 28 § 1 and consider the following factors:
"(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's findings of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
The Uniform Capital Sentence Report reveals that this 19 year old white male is a first time felony offender. He was 18 years old at the time of offense and at trial. He is not married and has no children. Rushing completed the 7th grade and at age 15 then dropped out of school. After he left school, his employment record includes sporadic work as a carpenter, general laborer and siding installer and a period of unemployment from 1981 to 1983. He was unemployed at the time of the arrest. Rushing admits to extensive and varied drug use, however, there is no evidence of addiction. Rushing has no criminal conviction and his adult criminal record contains only an arrest for hit and run driving.

Aggravating Circumstances
The jury found two aggravating circumstances, to-wit: the offender was engaged in the perpetration or attempted perpetration of an armed robbery or a simple robbery, La.C.Cr.P. art. 905.4(a) and that the *275 offense was committed in an especially heinous, arbitrary or cruel manner, La.C.Cr.P. art. 905.4(g).
The evidence fully supports the finding that the offense was committed during an attempted armed robbery. In Rushing's confession he admitted that the purpose of calling the cab was to commit an armed robbery. Although he did not take the cab driver's wallet, he admitted it was only the shock of killing the victim that prevented him from actually removing the wallet from the victim. At trial, Rushing stated he did not remember making any of these statements and tried to place the responsibility for the murder on Fussell. However, even at trial, Rushing admitted that they called the cab to rob the driver. There was sufficient evidence for which the jury could have found that the homicide occurred during an armed robbery.
This Court has upheld death sentences when at least one of the aggravating circumstances relied on by the jury is supported by the evidence, even though another aggravating circumstance found by the jury is not supported by the evidence, so long as the evidence of the possibly unproven circumstance did not inject an arbitrary factor into the proceeding. State v. Wingo, 457 So.2d 1159, (La.1984); State v. Glass, 455 So.2d 659 (La.1984); State v. Sawyer, 422 So.2d 95 (La.1983). In the instant case, there is evidence that the murder occurred during an armed robbery and the death sentence is adequately supported by one aggravating circumstance. State v. Glass, supra; State v. Kirkpatrick, 443 So.2d 546 (La.1983); State v. Monroe, 397 So.2d 1258 (La.1981). Although the defense counsel did not object to this testimony at trial, he now claims that the State injected an arbitrary factor into the sentencing portion of the trial when they asked three witnesses about the manner in which the homicide was committed. When there has been a finding of one legally sufficient aggravating circumstance, the failure of another aggravating circumstance does not introduce an arbitrary factor in the sentencing procedure unless this court determines that, but for, the influence of the evidence of the legally insufficient aggravating circumstance, the jury would not have brought in the death penalty. Edna Stiller, a co-worker of the victim, Ruby Gaspard, the victim's aunt, and Detective Mike Moore of the St. Tammany Sheriff's Department gave the opinion that Archer was killed in a cruel, heinous and atrocious manner. The most damaging of the statements was that of the detective who stated that in his 15 years of experience in the Sheriff's Department, this murder was one of the most vicious he had seen. The trial court erred in allowing the state to elicit opinions from the three witnesses on the manner in which the crime was committed as the statements were tantamount to opinions of the existence of an aggravating circumstance alleged by the State. Lay witnesses are not permitted to express opinions on an ultimate issue of fact presented to the jury because it usurps the role of the jury. State v. White, 450 So.2d 648 (La.1984). We, however, find that this testimony did not inject an arbitrary factor in the proceedings as there was overwhelming evidence of one aggravating circumstance (the defendant was engaged in an armed robbery at the time the victim was killed). Further, the jury could have determined from the other evidence that the murder was committed in a cruel, atrocious or heinous manner. The murder was particularly brutalthe victim was shot in the back at close range with a 20 gauge shotgun, beat about the face and head with the defendant's fists, and finally clubbed over the head with a shotgun fracturing the victim's skull three times. Thus, there is sufficient evidence to support the finding of this aggravating circumstance, albeit some of the evidence in support thereof was inadmissible. Any error in the admission of the lay witness opinion was harmless and did not influence the jury in returning the death sentence.
The defendant also objects because witnesses were asked for their opinions on what was the appropriate sentence for Rushing. Both the State and the defense *276 elicited testimony on this point. The State asked four witnesses what they thought would be an appropriate sentence for Rushing. Only one witness' testimony can be considered adverse to the defendant's interests. Ruby Gaspard was asked:
Q. "What would you feel would be an appropriate sentence for anyone who could do something like that to someone?"
A. My mother always told me vengence is mine sayeth the Lord. But I also believe an eye for an eye."
The three other witnesses responded to the State's questions on the appropriate sentence by stating that they did not believe the death sentence appropriate in this case. Introduction by the State of these opinions on the ultimate issue to be decided during the sentencing phase is prohibited. State v. White, supra. However, the defense counsel also asked similar questions during the direct examination of his witnesses. Both defense witnesses when questioned on the subject expressed opinions that Rushing should not die.
Considering no witness expressed an unqualified opinion that defendant should be sentenced to death and four of the witnesses stated he should not be sentenced to death, we do not believe nor are we of the opinion that Ruby Gaspard's testimony standing alone injected an arbitrary factor such that it influenced the jury to return with a death sentence.

Passion, Prejudice and Arbitrary Factors
There was no indication that passion or prejudice influenced the jury's verdict. The defendant is a white male, as was the victim. Further, the record indicates that the prosecutor was restrained in his arguments and emphasized the jury's duty to apply the law dispassionately. Although inadmissible testimony concerning the existence of an aggravating circumstance and the appropriate sentence for the defendant was introduced at trial, as discussed above, it did not result in an arbitrary factor being interjected into the proceedings.

Proportionality
Supreme Court Rule 28 § 4 mandates that we compare defendant's sentence to other sentences imposed in similar cases in the judicial district, considering both the crime and the defendant. There have been thirteen prosecutions for first degree murder in the 22nd Judicial District involving the present sentencing scheme, which is composed of St. Tammany and Washington Parishes. Of these thirteen cases, three resulted in the imposition of the death penalty.
In State v. Willie, 436 So.2d 553 (La. 1983), Robert Lee Willie and Joseph Vaccaro dragged a young woman into a wooded area and raped her. Willie then slashed her throat while Vaccaro held the victim down. Willie's death penalty was affirmed by this Court. Vaccaro received life imprisonment.
In State v. Kirkpatrick, 443 So.2d 546 (La.1983), the victim was murdered during the robbery of his home. He was struck twice with a heavy glass object causing severe cuts. He was then stabbed twice with a butcher knife in the chest and lower abdomen. Finally, the victim was shot in the head with a small caliber handgun.
In State v. Wilson, which has not yet been reviewed by this Court, the victim was ambushed by the side of the road when he stopped to render assistance to what appeared to be stranded motorists. A shotgun was shoved in his mouth and fired.
The defendant argues that the sentence imposed is disproportionate for the offender because he was 18 years old at the time of the offense and had no prior criminal convictions. Of the 4 death cases in the 22nd Judicial District Court, Rushing was the only defendant who was under twenty years of age and also the only one who had no criminal convictions. The defendant argued these facts as mitigating circumstances to the jury as well as claiming that the defendant was intoxicated and was under the influence of Fussell when he committed the offense. The jury refused to find that any of these factors mitigated or excused *277 Rushing's actions. Rushing had no reason to kill Archer, other than to satisfy himself that he had the courage to kill someone. The magnitude and viciousness of the crime led the jury to recommend death rather than life imprisonment.
The aggravating circumstances found in the present case and in Willie, Kirkpatrick and Wilson, supra, were that the killing was committed during the perpetration of a felony and that the crime was committed in an especially heinous, atrocious or cruel manner. In the instant case, as in Willie and Kirkpatrick, supra, repeated blows and injuries were inflicted upon the victim. Rushing shot the victim in the back, repeatedly punched the victim in the face and struck him over the head with the butt of the shotgun. The trial court compared this murder to the ones in Willie and Kirkpatrick, supra, stating that this one was just as senseless and atrocious as they were. Rushing had no reason to kill Archer other than to see if he could do it. Considering the manner in which this crime was committed and its senseless nature, we cannot disagree.
After considering the sentence review memorandums submitted by the State and the defendant, the crime and the defendant involved, we are unable to conclude that the sentence of death in the instant case is disproportionate to the penalty imposed in similar cases in the 22nd Judicial District Court.
For these reasons, the sentence should be affirmed.

DECREE
For the reasons assigned, defendant's conviction and sentence are affirmed.
AFFIRMED.
CALOGERO, J., dissents for the reasons assigned by LEMMON, J., and further being of the view that there is merit in defendant's Assignment of Error #'s 6 & 7.
LEMMON, J., dissents in part and assigns reasons.
LEMMON, Justice, dissenting in part.
Both aggravating circumstances found by the jury were supported by the evidence. The proved circumstances of this horrible crime were sufficient to support a finding that "the offense was committed in an especially heinous, atrocious or cruel manner". La.C.Cr.P. Art. 905.4(g).
The prosecutor, however, did not rest his case in the penalty phase on the evidence of the circumstances of the crime itself, but proceeded to introduce opinion evidence on atrociousness. This evidence introduced an improper and arbitrary factor into the determination of sentence.[1] Evidence of a particular person's opinion concerning the atrociousness of a particular crime is irrelevant and inappropriate to the jury's decision on sentence.[2]
The majority agreed that introduction of this evidence was error, but classified it as harmless. However, when the deputy sheriff (probably in full uniform), who represented "the law" to the average layman, testified that this was the most vicious murder in his 15 years of experience, I simply cannot say that the evidence did not influence at least one juror to decide to impose the death penalty. The evidence, therefore, was not harmless beyond a reasonable doubt.[3]State v. Gibson, 391 So.2d 421 (La.1980).
*278 I would affirm the conviction, but would remand for a new sentencing hearing.
NOTES
[1] Assignments 6 and 7 dealt with errors in the penalty phase of the trial and are discussed in our review of the sentence.
[2] Fussell pled guilty to second degree murder and received a sentence of life imprisonment without benefit of probation, parole or suspension.
[3] There is some uncertainty concerning the specific type of drug obtained by the defendant. In his confession, the defendant related that the drugs were blue Valiums. At trial, he stated that he was unsure of the type of drug purchased, but described them as "red capsules".
[4] Apparently after Rushing shot Archer in the back, the victim turned around and started swinging at the defendant. Rushing first reacted by hitting Archer with his fists, then he began beating the victim over the head with the shotgun.
[1] The jurors did not need the assistance of lay or expert opinion in determining "atrociousness". See Fed.R.Evid. 701, 702.
[2] In a somewhat analogous situation, this court has held that the views of a particular person or group concerning capital punishment are not appropriate factors for the jury's consideration in a capital case. See State v. Watson, 449 So.2d 1321 (La.1984).
[3] The opinion testimony by the law enforcement officer was particularly prejudicial because the jurors probably viewed him as an expert on the atrociousness of various forms of murder. This is not a proper subject of expert testimony. One of the dangers of allowing a witness to give opinion testimony under the banner of expert testimony is that jurors are likely to be unduly swayed by his opinions, and a reviewing court is unable to assess accurately the relevancy and value of the testimony. See People v. Collins, 68 Cal.2d 319, 66 Cal.Rptr. 497, 438 P.2d 33 (Cal.1968). See also State v. Wheeler, 416 So.2d 78 (La.1982); State v. Stucke, 419 So.2d 939 (La.1982).

As this court said in Wheeler (in reversing a conviction for improperly permitting a police officer to give an opinion on the likelihood of defendant's involvement in the distribution of illegal drugs):
"As the subject matter of the opinion approaches the hub of the issue, the risk of prejudice and hence of reversible error consequently increases. This is particularly so when the witness expressing the opinion is one, such as a police officer, in whom jurors and the public repose great confidence and trust." (Emphasis added.) 416 So.2d at 82.