497 So.2d 333 (1986)
STATE of Louisiana, Appellee,
v.
Carrie E. WILLIAMS, Appellant.
No. 18082-KA.
Court of Appeal of Louisiana, Second Circuit.
October 29, 1986.
Rehearing Denied November 26, 1986.
Stay Order Vacated; Writ Denied January 9, 1987.
*334 Richard C. Goorley, Indigent-Defenders Office, Shreveport, for appellant.
William J. Guste, Jr., Atty. Gen., Paul J. Carmouche, Dist. Atty., James E. Stewart, Gary Parker and John Broadwell, Asst. Dist. Attys., Shreveport, for appellee.
Before MARVIN, SEXTON and NORRIS, JJ.
NORRIS, Judge.
The defendant, Carrie Williams, was charged by grand jury indictment with the negligent homicide of her infant son, Timothy Dooley. LSA-R.S. 14:32. She was tried before a six-person jury and found guilty as charged. The trial judge sentenced her to four years at hard labor; the maximum sentence is five years at hard labor. She now appeals, relying on nine assignments of error.[1] Because none of the assignments present reversible error, we affirm.
On the afternoon of June 11, 1984, the emergency medical services personnel of the Shreveport Fire Department received a call for assistance at Carrie Williams's residence in the 200 block of Rutherford Street. Two units hurried to the scene. *335 When they arrived shortly after 2:00 p.m., they found one-year old Timothy Dooley lying on the cement front porch. June 11, 1984 was Timothy's first birthday. His body was very red as he had suffered from burns, specifically scald burns from partial immersion in hot water. He was taken to the hospital where he died several hours later from congestive heart failure due to the combined effects of scalding and drowning.
Timothy had been left in the four-plex residence with his sister Angela, age two. His five-year old brother, Christopher, was playing outside with a neighbor, eight-year old Jeff Peck. Angela was asleep in the lower level of a bunk bed. Timothy had been left sleeping in the bathtub, which the defendant had lined with sheets and blankets for padding. The mother left the house with her boyfriend, Paul Craig, to run an errand and was gone 45 minutes to an hour. While she was gone, Timothy apparently awoke, activated the hot-water tap, and was scalded when the sheets and blankets clogged the drain. When they came back from the errand, Paul Craig entered the locked house, found the infant, carried him to the porch and successfully resuscitated him. Fire department personnel arrived shortly afterward, administered emergency help, and took the child to the burn unit at LSU Medical Center. Timothy died at 4:45 that afternoon.
At the scene, Carrie Williams first denied any knowledge of how Timothy got into the tub. It is an old-fashioned tub with "ball and claw" feet, sitting seven inches off the floor and measuring 22½ inches from floor to rim. She later admitted placing the infant in the tub to sleep because his playpen was infested with roaches and ants. She denied having left the house for more than 45 minutes, and insisted that she had asked the neighbor boy, Jeff Peck, to "watch the baby" when she left. She denied locking the house behind her. We will develop and analyze the facts in greater detail in discussion of assignment No. 9.

ASSIGNMENT NO. 1
By this assignment, Williams claims the trial court erred in limiting the voir dire examination of juror Marie Jarret. Ms. Jarret admitted that she had read a newspaper account of the incident at the time of the death and had heard a radio account of the impending trial on her way to court that morning. R. pp. 229; 231. She testified, however, that she did not think the newspaper was always right and she would not pass blame without knowing all the facts. She said she had formed no opinion about Williams's guilt or innocence as a result of either media account. Defense counsel asked the following questions:
Q. We're not asking you to judge the case at this time. That would be improper. All we want to know is about what went through your mind when you heard about these things, whether you made any sort of judgment based on what you heard at that time.
A. No.
Q. I'm not talking about just guilt or innocence. I'm talking about other things.
R. p.p. 231-232.
The state objected, arguing that the prospective juror need be asked nothing more than her opinion as to guilt or innocence. The court sustained the objection.
Williams correctly asserts that every criminal defendant has the "right to full voir dire examination of prospective jurors and to challenge jurors peremptorily." LSA-Const. Art. I § 17. Voir dire examination must be broad enough in scope not only to pinpoint grounds of a challenge for cause but also to provide information that would enable counsel to exercise one of his peremptory challenges intelligently. State v. Drew, 360 So.2d 500 (La.1978), cert. denied 439 U.S. 1059, 99 S.Ct. 820, 59 L.Ed.2d 25 (1979); State v. Williams, 346 So.2d 181 (La.1977).
The trial judge nevertheless has great discretion in the examination of jurors. LSA-C.Cr.P. art. 786. Whether a particular question is essential to voir dire *336 is best governed by the liberal discretion of the trial judge under the prevailing facts and circumstances. State v. Jackson, 450 So.2d 621 (La.1984). Thus we have held that reversible error occurs only when the voir dire examination as a whole shows that the abridgment of questioning led to substantial prejudice. State v. Pettaway, 450 So.2d 1345 (La.App. 2d Cir.1984), writ denied 456 So.2d 171 (La.1984).
We feel that the question, framed in ambiguous reference to "other things," was too broad for response. The trial judge correctly sustained the objection. This was not, however, the end of defense counsel's examination. He formulated several more questions[2] which, we are convinced, addressed the "other matters" that could have led the defense to exercise one of its peremptory challenges. The rephrased question certainly allowed the defense to make its point. See State v. May, 339 So.2d 764 (La.1976). We can see no reversible error under the circumstances.
Furthermore, we note that the defense never moved to excuse Ms. Jarret either for cause or peremptorily, even though she was the last juror and the defense had three peremptory challenges remaining. Instead, the defense accepted Ms. Jarret. This suggests that defense counsel was satisfied with the subsequent questions and answers. The harm, if any, of refusing the challenged question, was minimal. This assignment lacks merit.

ASSIGNMENTS NOS. 2 & 3
By her second assignment, Williams claims the trial court erroneously refused to grant a mistrial when the prosecutor in opening statement observed that the firefighters had arrived to find "flies swarming all over" the infant. R.p. 246. By her third assignment, she claims the trial court wrongly permitted a witness, Capt. Barron, to testify that when he arrived the baby was unattended and flies were "getting on" him. R.p.p. 255-256. We will discuss these assignments together since defendant's argument is essentially the same for both. She contends that the mention of the flies was irrelevant, highly prejudicial, and deprived her of a fair trial.
We note at the outset that the prosecutor's opening statement does not fall within any category of grounds for mandatory mistrial. LSA-C.Cr.P. art. 770. Thus Williams had to prove discretionary grounds. Generally, a mistrial is not available for remarks outside the scope of art. 770 unless the court is satisfied that an admonition to the jury would not assure the defendant a fair trial. LSA-C.Cr.P. art. 771. The prosecutor in his opening statement may advert to all admissible evidence. LSA-C.Cr.P. arts. 766, 769.
We will first consider whether Capt. Barron's remark was "irrelevant or immaterial" and "of such a nature that it might create prejudice against the defendant."
The test of relevance is whether the evidence tends to show the commission of the offense and the intent. LSA-R.S. 15:441. Williams argues that the particular act of criminal negligence was leaving her baby unattended in the bathtub. This is not correct. Neither the indictment nor the negligent homicide statute is so limited. The indictment charges that she "negligently killed Timothy Dooley." R. p. 11 There is no doubt that her failure to tend to her seriously injured son shows just as much negligence as leaving him in the *337 bathtub. Her lack of care after the tragedy was discovered is a continuation of the original, criminally negligent act. It is therefore part of the res gestae and was admissible. LSA-R.S. 15:447, 448; State v. Doucet, 443 So.2d 777 (La.App. 3d Cir. 1983); State v. Hammontree, 363 So.2d 1364 (La.1978).
On the question of prejudice, we agree that the mention of flies on a scalded baby is somewhat distasteful. However, once the evidence is shown to be relevant, we are most reluctant to exclude it on grounds of prejudice. State v. Smith, 418 So.2d 515 (La.1982); State v. Morgan, 444 So.2d 325 (La.App. 1st Cir.1983). A bloodstained shirt was admissible in a trial for armed robbery, over the defendant's argument that it created prejudice and hostility. State v. Martin, 472 So.2d 91 (La.App. 5th Cir.1985). The oral description in the instant case is much less graphic than the shirt in Martin. Moreover, Capt. Barron's words were not intentionally callous or demeaning. His description seems neutral and accurate, and it was corroborated by his driver, Sonny Clary. We do not feel the contested words created enough prejudice to justify their exclusion. In sum, Capt. Barron's testimony was admissible.
Because Capt. Barron's statements were admissible, the prosecutor was entitled to refer to them in opening statement. LSA-C.Cr.P. art. 766 provides that in opening statement the state shall set forth, in general terms, the nature of the evidence; in fact, art. 769 requires the opening statement to cover the evidence or it will not be admitted. Thus there was no error in overruling the trial court's motion for a mistrial when the prosecutor mentioned Capt. Barron's testimony. These assignments do not present reversible error.

ASSIGNMENT NO. 4
By this assignment, Williams claims the trial court erred in allowing the witness Pat Dyas to testify about her opinion of the defendant's emotional state. Ms. Dyas testified that at the hospital, Williams "seemed a lot calmer than you would expect a person with a baby in the condition that it was in." R. p. 296. The defense objected, arguing that the testimony was irrelevant and introduced solely to appeal to the jury's emotions. On appeal, the state contends that Ms. Dyas was describing facts within her own knowledge.
We admit that the contested remarks, if taken alone, could be construed as a comment on the defendant's disregard and lack of concern for her child. We feel, however, that the remark must be taken in context. By her own admission, Ms. Dyas did not notice the defendant's condition at the scene, when it would have been most immediately influenced by the catastrophic events. R. p. 296. Ms. Dyas did not observe her during the ambulance ride because the defendant sat in the front cab while Ms. Dyas rode in the back with the infant. Ms. Dyas said she did not notice Williams's emotional state until "later" at the hospital. On cross examination, she agreed that not everyone would react the same way under those extraordinary circumstances. Thus her testimony as a whole dilutes the potentially prejudicial effect that the isolated statement could have had.
We also think that the calm emotional state that Ms. Dyas described could indicate that Williams did not yet understand the gravity of the baby's injuries, or that she was in a state of shock.
Finally, Ms. Dyas was not the only witness to offer an assessment of Williams's emotional state. Sonny Clary, the first driver on the scene, said she "wasn't hysterical or anything like that." R. p. 278. Randy Cochran, Ms. Dyas's driver, said her emotional condition was "calm." R. p. 289. These descriptions came in without objection. Ms. Dyas's testimony does not add much to these, and its effect is too minor to have impaired Williams's substantial rights. LSA-C.Cr.P. art. 921. This assignment does not present reversible error.

ASSIGNMENTS NOS. 5 & 6
By her fifth assignment, Williams claims the trial court erred in finding that the *338 witness Jeffrey Lee Peck had the proper understanding and ability to recall the events about which he was to testify. She especially claims that Jeff's mother, Mrs. McGee, coached him a few days before trial and "reminded" him of facts he did not himself remember. By her sixth assignment, Williams claims that Jeff violated the rule of sequestration by talking about the case with his mother. Because of their similar factual bases, we will consider these assignments together.
The test of competency for children under twelve years of age is governed by LSA-R.S. 15:469, which provides that "understanding, and not age, must determine whether any person tendered as a witness shall be sworn." The trial court held a voir dire examination outside the jury's presence the day before Jeff testified. Both the state and the defense interrogated him five times on voir dire. He related that he was nine years old, attended Caddo Heights Elementary and was in third grade. He distinguished between the teachers he had this year and last year. He gave his current address but could not remember the Rutherford St. address. This is where he lived when the instant events occurred. He remembered talking to the prosecutor before. He knew where he was ("a court") and what he was there about ("the one-year old baby"). He knew that a courtroom is for "testifying against people." He said he understood that he had taken an oath to tell the truth and would say "what he knew." He testified that no one had told him what to say. On his first cross-examination, he indicated that people who told lies in a courtroom get put in jail. He added that he believes in God, attends church sometimes, and believes that if you tell a lie God will punish you. After this, the inquiry turned to the alleged sequestration violation, to which we will turn later.
The trial judge's determination of competency under 15: 469 is entitled to great weight because the trial judge can see and hear the witness. State v. Helsley, 457 So.2d 707 (La.App.2d Cir.1984); State v. Humphrey, 412 So.2d 507 (La.1982), after remand 445 So.2d 1155 (La.1984). Even without the benefit of observing Jeff's demeanor on the stand, we can confirm the trial judge's ruling on our reading of the record. The witness was alert and honest, admitting when he did not know the answer requested. There is nothing in the record to suggest that the trial judge erred.[3] This assignment is without merit.
As for the violation of sequestration, the testimony is a little more difficult.[4] Jeff admitted there were some details he could not remember until his mother reminded him. Jeff also said, however, that he remembered some things his mother did not. R. p. 355. Jeff denied that his mother had told him what to say on the stand. He said he would testify only to things he remembered, and repeated that he knew things that his mother did not know. He admitted speaking to his mother before the rule was imposed. R. p. 356. On re-cross, the defense inquired into the merits of what the witness remembered. Jeff insisted he could differentiate between his own recollection and what his mother told him. On redirect, Jeff showed the ability to resist having words "put in his mouth."[5]
*339 Later the state asked Jeff about the time frame of the occurrence. He answered intelligently and responsively. At the end of this, the trial judge accepted him as a witness.
Jeff was then returned to the stand on the issue of the rule violation. He testified that on leaving the courtroom his mother asked if his testimony was over. He told her no, and told her he had mentioned their earlier discussion. She corrected him about what day their conversation had taken place, Monday night instead of Tuesday night. He told her nothing else. He said no one had ever advised him of the sequestration rule, the defense made its objection to the Monday night conversation in which Jeff's mother allegedly refreshed his memory.
Jeff's mother was not called to testify on this issue. The state presented the testimony of the prosecutor, James Stewart, in rebuttal. Mr. Stewart's testimony supports the position that Jeff had an independent basis for memory of the events in question. Although Mr. Stewart had encountered some difficulties in interrogating Jeff, these difficulties were no greater than could be expected with any young witness. There was no evidence that Jeff's testimony had been coached or improperly influenced between the initial interviews and the voir dire examination.
The purpose of sequestration is dual. It assures that a witness will testify from his own knowledge without being influenced by the testimony of prior witnesses. It also serves to strengthen the role of cross-examination in developing facts. State v. Jackson, 452 So.2d 1225 (La. App.2d Cir.1984); State v. Warren, 437 So.2d 836 (La.1983). Not every violation of a sequestration order must result in the exclusion of the witness's testimony. Absent any evidence that the testimony was tainted by the violation, the trial judge may properly rule that the testimony not be excluded. State v. Edsall, 385 So.2d 207 (La. 1980); State v. Parker, 421 So.2d 834 (La.1982), cert. denied 460 U.S. 1044, 103 S.Ct. 1443, 75 L.Ed.2d 799 (1983). This is exactly the case here. Even though Jeff admitted unintentionally violating the rule, he kept his own testimony straight and was steadfast in testifying to his personal knowledge only. There is no evidence of taint necessary to justify exclusion of the testimony.
These assignments do not present reversible error.

ASSIGNMENT NO. 7
By this assignment Williams claims the trial court erroneously allowed to be shown to the jury three photographs that were prejudicial and inflammatory in effect. The state came to trial with many photographs. S-3 was taken at the hospital immediately after the child died. S-16 through S-27 were taken at the morgue. Over strenuous objection, the court admitted four pictures, S-3, S-17, S-23 and S-27.[6] The defense offered instead a diagram that the coroner, Dr. McCormick, drew to show the burn pattern on the body.
The rule governing the admissibility of allegedly gruesome photographs requires a determination of whether their probative value outweighs their probably prejudicial effect on the jury. State v. Redwine, 337 So.2d 1041 (La.1976). Photographs which are calculated to arouse the sympathies or prejudices of the jury are properly excluded if they are entirely irrelevant or not substantially necessary to show material facts or conditions. State v. Alexander, 252 La. 564, 211 So.2d 650 (1968). Photographs of the body of the deceased victim have generally been held relevant to prove the corpus delicti, to corroborate other evidence of the manner in which death occurred, to establish the location, severity and number of wounds, and to establish the identity of the victim. *340 State v. Gaskin, 412 So.2d 1007 (La.1982); State v. Lewis, 353 So.2d 703 (La.1977). We have found only two cases in which the supreme court reversed on the issue of gruesome photographs. See State v. Morgan, 211 La. 572, 30 So.2d 434 (1947); State v. Morris, 245 La. 175, 157 So.2d 728 (1963); see also Justice Tate's concurrence in State v. Smith, 327 So.2d 355, 364 (La. 1976).
According to Dr. McCormick, the photos were necessary to show the manner of death. Apparently the child had been standing in the tub for some period of time while the water was rising around him. This accounted for the extremely severe burning on the legs, where no skin remained except in creases behind the knees. Dr. McCormick felt that the child, eventually overcome by the heat, fell face forward into the water and floated for some time. This explains why the burns to the chest and face are not as extensive, and why the back and the arms were spared. It also corroborates the medical determination that death resulted from congestive heart failure from drowning. Dr. McCormick added that his diagram, D-1, would not show the extent or degree of burning because it depicted only the third degree burns. It would also be of little help in showing the child's position in the tub during the incident. We think these photos, though shocking, were necessary to establish the location, severity and extent of the burns. They also served to corroborate other evidence of the manner of death. Under these circumstances, the probative value outweighs the prejudicial effect of the photographs. There was no error to admit them. State v. Gaskin, supra; State v. Kelly, 362 So.2d 1071 (La.1978), cert. denied 439 U.S. 1118, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979). This assignment does not present reversible error.

ASSIGNMENT NO. 9
By this assignment Williams contends that the evidence taken in light most favorable to the prosecution does not support a verdict of guilty and that the state did not prove that the actions constituted criminal negligence. She concedes that her actions constituted negligence but not criminal negligence; the distinction between those two degrees of negligence is crucial to an analysis of the facts. LSA-R.S. 14:32 defines negligent homicide as "the killing of a human being by criminal negligence." LSA-R.S. 14:12 defines criminal negligence as follows:
Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.
The Reporter's Comment to this section states that criminal negligence corresponds to the concept of "gross negligence" in tort law, as announced in Restatement of the Law of Torts (1934) §§ 282-284, 500. The supreme court has repeatedly analyzed cases of negligent homicide by a close scrutiny of the facts and § 500 of the Restatement. See State v. Jones, 298 So.2d 774 (La.1974); State v. Hargrave, 411 So.2d 1058 (La.1982). Section 500 provides:
The actor's conduct is in reckless disregard of the safety of another if he intentionally does an act or fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result to him.
Subsections (f) and (g) of that section provide:
Reckless misconduct differs from intentional wrongdoing in a very important particular. While an act to be reckless must be intended by the actor, the actor does not intend to cause the harm which results from it. It is enough that he realizes or, from facts which he knows, should realize that there is a strong probability that harm may result, even *341 though he hopes or even expects that his conduct will prove harmless. However, a strong probability is a different thing from the substantial certainty without which he cannot be said to intend the harm in which his act results.
Reckless misconduct differs from negligence in several important particulars. It differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency in that reckless misconduct requires a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man. It differs not only from the above-mentioned form of negligence, but also from that negligence which consists in intentionally doing an act with knowledge that it contains a risk of harm to others, in that the actor to be reckless must recognize that his conduct involves a risk substantially greater in amount than that which is necessary to make his conduct negligent. The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of the risk, but this difference of degree is so marked as to amount substantially to a difference in kind. (emphasis added)
The emphasized portions of these subsections show what we consider crucial to an analysis of the facts. We have no doubt that the defendant owed a duty to her son to care for him the way any reasonable parent would. We are called to determine whether her acts fell below that duty of care. We have asked whether the defendant knew or should have known that harm may very probably result, even though she may have expected or hoped that the conduct would prove harmless. We have also asked whether she took a conscious course of action with knowledge of the serious danger, when that knowledge should have disclosed the danger to a reasonable person.
Our review of the facts is also guided by Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The evidence in the record, when viewed in light most favorable to the prosecution, must be sufficient for a rational factfinder to conclude that the essential elements of the crime were proven beyond a reasonable doubt.
The record is long and difficult. There was testimony from five Shreveport firefighters, two police detectives, two physicians, a deputy coroner and three lay witnesses. The medical and forensic evidence clearly establishes that the baby was left in a bathtub and was not able to escape. The hot water knob was easy to turn on. When it was activated, very hot water came out. The accumulated water reached 100 degrees in 32 seconds, 110 degrees in 46 seconds, 120 degrees in 53 seconds, 130 degrees in 77 seconds, and a maximum of 138 degrees in 121 seconds, or two minutes and one second. At full pressure, the water would reach the overflow drain in 14 minutes and 30 seconds; the accumulated water then was still between 130 degrees and 138 degrees. R. p. 435. Water that hot can cause third degree burns in three to ten seconds. R. p. 409. Dr. McCormick estimated that the child may have lain in the water from two to fifteen minutes. R. p. 486.
We think the great speed with which scalding water accumulates should have suggested to the defendant that her baby would be at risk within a very short time if left unattended in a bathtub full of materials that could clog the drain. The facts suggest a number of options that the defendant forewent in favor of the tragic decision she made to leave the baby alone for so long. She could have left her front door unlocked and instructed the neighbor boy, Jeff, explicitly to watch the infant. She could have taken the baby to her next door neighbor, Mrs. Martin, who did babysitting. Instead, she left the child unattended, in a place that was hazardous.
*342 Furthermore, she did not have to leave the child. When she went to the store, she was accompanied by her boyfriend, Paul Craig. Both of them had cars and both could drive. The short shopping errand could have been done by one, leaving the other to watch the child. Instead, both left.
Perhaps the most incriminating aspect of this is the amount of time spent away. In brief, Williams admits she was gone 45 minutes; some witnesses put this longer, at as much as an hour and a half. R. p. 416. If the shopping trip was intended to consume that much time, she should have scheduled it differently to accommodate the child's needs; if the trip really was brief, she should not have let it take so long.
Her election to leave the child unattended so long bespeaks a conscious choice of a course of action that she should have known would pose serious danger. Restatement § 500(g). The instrumentality of the danger, the scalding hot water, posed a harm so menacing and sudden that the injury was really inevitable if the baby was left for even a short time. Thus there was an extremely strong probability that serious harm would result. It is of no moment that the harm would have been averted if only the child had slept through and not touched the faucet. Restatement § 500(f). We have closely studied the most factually apposite case in the jurisprudence, State v. Lilly, 468 So.2d 1154 (La.1985).[7] In that case the defendant was convicted of the negligent homicide of her eight-day old son. The child was suffering from pneumococcal meningitis which could perhaps have been treated if the mother would have noticed the symptoms and brought him to a pediatrician. After an adverse ruling in the court of appeal, 459 So.2d 1313 (La.App. 1st Cir.1984), the defendant applied for writs and the supreme court reversed her conviction. The court cited the lack of direct evidence of the symptoms that the baby might have shown. LSA-R.S. 15:438; Jackson v. Virginia, supra. We would concur in that holding while noting the abundance of direct evidence in the instant case. The evidence before us provides an ample basis for addressing the issues under Restatement § 500 and the Lilly case is therefore distinguished.
Defendant's main justification for putting Timothy in the tub was her assertion that the playpen was infested with ants and roaches. The defendant's mother, Mrs. Williams, testified to this. However, the other witnesses who surveyed the scene on the day of the incident and the days immediately afterward said they saw no infestation in the playpen.[8] Viewing this evidence in the light most favorable to the prosecution, a rational factfinder could have disregarded this basis of the alleged justification; but even if that justification were valid, it would not offset the reckless exposure to an instrumentality much more dangerous than the infested playpen.
In sum, we conclude that the defendant's acts of leaving the baby unattended, when there were ways to avoid it, and of exposing him to a potentially fatal instrumentality, for even a short time, satisfied the requirements of the Restatement for gross negligence. They therefore meet our statutory definition of criminal negligence under R.S. 14:12, and a rational factfinder viewing the facts in light most favorable to the prosecution could have so found. Jackson v. Virginia, supra.
This assignment does not present reversible error.

ASSIGNMENT NO. 10
By this assignment Williams claims the sentencing judge imposed an unconstitutionally *343 excessive sentence in violation of LSA-Const. Art. I § 20. Her maximum sentencing exposure was five years, so her actual sentence of four years[9] is legal but in the upper range. A sentence may be within statutory limits and nevertheless be excessive. State v. Sepulvado, 367 So.2d 762 (La.1979).
On appeal, she claims the sentencing judge placed too much emphasis on unfavorable information reported in the PSI. In opposition, she urges that she is a first felony offender for whom a suspended sentence would be appropriate. She also urges that she has recently been married and that a period of incarceration would subject her family to great hardship. We will discuss each of these assertions.
Like the sentencing judge, we have noted defendant's first felony status. Under LSA-C.Cr.P. art. 893, a first felony offender may receive a suspended sentence. We have interpreted art. 893, however, as discretionary and not mandatory. State v. McKethan, 459 So.2d 72 (La. App.2d Cir.1984). Thus the sentencing judge is not obligated to impose a suspended sentence but may, at his discretion, impose a term of imprisonment. The trial court's refusal to give a suspended sentence under art. 893 is not grounds for calling the sentence excessive.
Her other two assertions pertain to the sentencing judge's compliance with the guidelines in LSA-C.Cr.P. art. 894.1. We note initially that defendant has never complained that the information in her PSI is incorrect.[10] Rather, she urges the emphasis on certain information was too great. The PSI related a long history of child neglect. According to neighbors and the DHHR child welfare workers, Williams would leave her children alone and unattended for long stretches of time. The sentencing judge felt that an accident like Timothy's death was a natural consequence of her pattern of conduct, a kind of inevitable conclusion, and we agree. Under these circumstances, the sentencing judge had definite answers to two of the crucial sentencing guidelines: the defendant's criminal conduct was the result of circumstances very likely to recur, and the character and attitudes of the defendant indicate that she is indeed likely to commit another crime. LSA-C.Cr.P. art. 894.1 B (8) and (9). These conclusions are supported by the facts.
The PSI further revealed that Williams had been uncooperative and arrogant with corrections officials since her conviction. She even lodged threats with a child protection agent. Also since her arrest on the instant offense, she has been arrested for forgery and for being drunk. R.p. 572.
As for Williams's quarrel with the prior crime determination, a factor in 894.1 B(7), we repeat that the sentencing judge may consider other criminal activity even if it would be inadmissible at trial and even if it did not result in a conviction. State v. Taylor, 454 So.2d 1216 (La.App.2d Cir. 1984); State v. Washington, 414 So.2d 313 (La.1982). Her argument on this score is meritless.
She finally asserts that incarceration will subject her family to undue hardship. Imprisonment always imposes a degree of hardship. Williams has not particularly alleged that she supports anyone financially; and according to the PSI all of her other children have been placed in custody of the state, so it is not as though the children are being left helpless. Thus the alleged hardship is not so great that it overcomes the need of a custodial environment that can be provided most effectively by commitment to an institution.
In sum, there are no mitigating circumstances operating in this defendant's favor. Thus we can find no abuse of the judge's sentencing discretion. Admittedly this sentence *344 is in the upper range, but given all the aggravating circumstances it is not unconstitutionally excessive and it does not shock our sense of justice. State v. Bonanno, 384 So.2d 355 (La.1980). This assignment does not present reversible error.
For the reasons expressed, the conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] She originally urged ten assignments but No. 8 is neither argued nor briefed so it is considered abandoned. URCA-Rule 2-12.4; State v. Domingue, 298 So.2d 723 (La.1974).
[2] Q. You have not formed an opinion; is that correct?

A. That's correct.
Q. Have you formed any kind of opinion about the defendant, about Carrie Williams, about whether she is a good person or a bad person?
A. No.
Q. Based on what you heard?
A. No.
Q. Neither way?
A. No.
Q. Do you have any preconceived ideas based on what you heard? I realize you haven't heard any evidence, and I'm not asking you to make a decision. All I want to know is if you have any preconceived ideas based on what you've heard or read when you came in here.
A. No.
R.p.p. 233-234.
[3] We also note that eight and nine-year olds are generally held competent to testify. See State v. Helsley, supra; State v. Foy, 439 So.2d 433 (La. 1983); State v. Edwards, 420 So.2d 663 (La. 1982); State v. Humphrey, supra; State v. Thompson, 364 So.2d 908 (La.1978); State v. Francis, 337 So.2d 487 (La.1976); State v. Sharp, 338 So.2d 654 (La.1976); State v. Flores, 169 La. 22, 124 So. 132 (1929); State v. Carricut, 157 La. 140, 102 So. 98 (1925).
[4] LSA-C.Cr.P. art. 764 provides:

Art. 764. Exclusion and conduct of witnesses
Upon its own motion the court may, and upon request of the state or the defendant the court shall, order that the witnesses be excluded from the courtroom or from where they can see or hear the proceedings and refrain from discussing the facts of the case or the testimony of any witness with anyone other than the district attorney or defense counsel. The court may modify its order in the interest of justice.
[5] Q. Do you remember she told you that Carrie Williams told you to watch Chris?

A. I told her.
R.p. 359
[6] Williams has not argued on appeal the admission of S-3. S-17 is an abdominal shot, S-23 shows the back side of both legs, and S-27 is a facial shot.
[7] State v. Rutecki, 469 So.2d 1005 (La.App. 5th Cir.1985), writ denied 476 So.2d 348 (La.1985) was a negligent homicide case in which the defendant let her newborn baby drown in a toilet. She pled guilty so there was no discussion of sufficiency of the evidence. There have also been several cases on cruelty to a juvenile for scald burns but in those cases the burns were noted as probably intentional. State v. Sumler, 395 So.2d 766 (La.1981); State v. Scott, 400 So.2d 627 (La.1981); State v. Green, 449 So.2d 141 (La.App. 4th Cir.1984).
[8] See Capt. Strealy's testimony, R.p. 307, and Detective Spalding's, R.p. 333.
[9] The assignment of error incorrectly refers to the sentence as five years.
[10] If so, she would have the opportunity to traverse it. State v. Underwood, 353 So.2d 1013 (La.1979); State v. Roberts, 427 So.2d 1300 (La. App.2d Cir. 1983), writ denied 435 So.2d 440 (La.1983).