526 So.2d 406 (1988)
STATE of Louisiana
v.
Felton HODGES and Myron Hodges.
No. KA 5362.
Court of Appeal of Louisiana, Fourth Circuit.
May 12, 1988.
*408 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Terry M. Boudreaux, Asst. Dist. Atty., New Orleans, for plaintiff-appellee.
Arthur L. Harris, Sr., Ernest L. Jones, Jones Associates, Ltd., New Orleans, for defendants-appellants.
Before GARRISON, WARD and ARMSTRONG, JJ.
ARMSTRONG, Judge.
The defendants, Felton and Myron Hodges, were charged by true bill with the second degree murder of Paul Brown, a violation of LSA-R.S. 14:30.1. Following a jury trial they were both found guilty as charged. They were each sentenced to life imprisonment without benefit of parole, probation or suspension of sentence.
On December 20, 1984 Albert Reagle, the owner of an amusement company, made his weekly trip to Flynn's Den, a lounge in New Orleans, to collect money from its music box. Upon arriving, he noticed that, contrary to custom, the iron doors of the bar were ajar. He also noticed that the manager's car was not there. Reagle and Paul Brown, the manager of Flynn's, had earlier agreed to meet that day in order to settle the money for the music box and for Brown to make his payment on the lease purchase of a console T.V.
Suspecting something was wrong, Reagle went to Brown's apartment above the bar. The door was open, and he noticed that the television which he had put there the night before was gone. He also noticed that the apartment was ransacked. He returned to the bar but did not walk in for fear of activating the alarm system. He called one owner of the bar, Wellington Beaulieu, and told him what he had seen. Reagle and Beaulieu met and entered the bar together. They found Paul Brown dead on the floor of the bar. The autopsy revealed that Brown died of five stab wounds to the chest, one of which passed through the heart and esophagus, the other four through the left lung. In addition to the stabbings, the victim had been severely beaten with a blunt object.
Several state witnesses, some of whom were patrons of the bar, testified that they saw the defendants with the victim in the bar until approximately 3:00 a.m. on the night of the killing.
The state's two primary witnesses, Harold Ward and Darrel Esnault, testified at trial that while using the telephone outside of Flynn's Den, they saw the victim and the defendants leave the bar, go upstairs to Brown's apartment, and then return to the bar. They later observed the defendants carry stereo equipment and other items from Brown's apartment and put them in Brown's car. According to Ward and Esnault, Myron Hodges enlisted their help in carrying the property to the car. While Myron Hodges, Ward and Esnault were in the apartment, the defendant Felton Hodges drove the car away with the equipment without telling the others. Ward and Esnault both testified that Myron Hodges, upon discovering that Felton had left, became upset and repeatedly said that his "shit was on the line" and that his brother was probably going to sell the equipment. The defense continually objected to this line of testimony.
*409 Ward testified that Myron Hodges took him and Esnault into the bar in order to give them some liquor as payment for their help. Ward testified that he saw the victim lying on the bar floor and asked Myron Hodges what was going on. Myron responded by saying, "Don't worry about it... He is dead". According to Ward, Myron Hodges said that he had hit the victim with a crescent wrench. Esnault denied ever actually entering the bar.
Myron Hodges asked Ward and Esnault if they had a car. They did not, but Ward suggested that his friend, Eugene Aguillard, lived nearby and might be able to help. With Aguillard's assistance, Myron Hodges, Ward and Esnault proceeded to drive around New Orleans looking for Felton. They eventually found the car and property at the defendants' aunt's home in the Florida Housing Project in New Orleans. They removed the equipment and liquor from the Project and took it to a rear apartment on North Prieur Street in New Orleans. Ward, Esnault and Aguillard then drove Aguillard's car to Aguillard's home. From there Ward and Esnault walked to the bar. Myron drove the victim's car to the bar. Myron previously had told the men that there was money in the safe that he would share with them. Ward and Esnault denied ever receiving any money but testified that they were given liquor instead. They also testified that Myron Hodges told them to keep their mouths shut about the events of the night.
The day after the incident Aguillard saw a report of the killing on the news. He contacted the police the following day. He also asked his sister to tell Ward and Esnault that they, too, should notify the police. Ward and Esnault did contact the police and gave statements.
A physical line-up subsequently was held and attended by Esnault and Aguillard as well as several individuals who had been in the bar on the night of the murder. The defendants were positively identified by all but one of the patrons as having been with the victim shortly before closing time, and by Ward and Esnault as being the men they had helped.
When he initially gave his statement to police, Aguillard was shown a photographic line-up. He was not able to identify the defendants from the photo-array prepared by the police. While at the police station, however, he noticed photos lying on a desk and picked out Myron Hodges as the man whom he had assisted on December 20, 1984. Aguillard accompanied police to North Prieur Street in order to identify the house to which he transported the property. He identified 1513 North Prieur Street.
A search warrant was issued for 1513 North Prieur Street, which was near the home of the defendants, who lived at 1519 North Prieur Street. While attempting to execute the warrant the officers spotted the defendants exiting 1519 North Prieur. The defendants were arrested, and the police searched the rear apartment at 1519 North Prieur. The search was based upon the consent of defendants' mother and stepfather. The items which were found in the defendants' apartment were positively identified as the victim's property.
Myron Hodges testified at trial. He admitted that he had had previous business contacts with the victim concerning music engagements and minor maintenance jobs. Myron also admitted that he and his brother were at the bar on December 20, 1984. Myron stated that they left Flynn's intoxicated at about 3:00 a.m. According to Myron, Ward and Esnault took the property from the victim's apartment, and he and his brother only assisted them in placing the property in the victim's car. He stated that Eugene Aguillard, Esnault's friend, was asked to assist the others after Felton Hodges drove away with the victim's car. Myron stated that Esnault allowed him to bring the property to his home because Esnault wanted Aguillard to believe that the victim's car and the property belonged to Myron. Myron claimed that he intended to return the property to the victim later.
On appeal the defendants rely on ten assignments of error.

ASSIGNMENT OF ERROR NO. 1
By this assignment of error the defendants argue that the trial court erred when *410 it denied their motion for mistrial after the State commented on the fact that Felton Hodges did not testify at trial.
At trial the State made the following comment during the cross-examination of Myron Hodges:
Q Mr. Hodges, were you in court for every hearing in this case?
A Every hearing except the preliminary hearing.
Q Preliminary hearings are down in Magistrate Court. There wasn't a preliminary hearing, was there, because you were charged by indictment by a Grand Jury.
A Well, look, sir, I am not too familiar with law procedures.
Q You know what a preliminary hearing is.
A I am not sure what it is.
Q Well, did I give you that word or did you give it to me?
A I gave it to you.
Q Does your brother talk as well as you do?
A I guess that would be a matter of opinion.
The defense objected on the ground that the question denied the defendant, Felton Hodges, his Fifth Amendment right against self-incrimination. The defense did not, however, move for either a mistrial or an admonition to the jury.
La.C.Cr.P. art. 770(3) specifically prohibits the State from making comments within the hearing of the jury which refer directly or indirectly to the failure of the defendant to testify in his own behalf. That article provides in pertinent part:
Art. 770. Prejudicial remarks; basis of mistrial
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(3) The failure of the defendant to testify in his own defense;
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
Though the State argued that its statement was simply intended to comment on the smooth style of Myron Hodges, the defense asserts that it could be construed as a disguised reference to Felton Hodges' failure to testify on his own behalf. "Such a statement constitutes reversible error if the statement was intended to draw the attention of the jury to the defendant's failure to testify." State v. Smith, 433 So.2d 688, 697 (La.1983); State v. Wormser, 467 So.2d 58, 60 (La.App. 4th Cir.1985). Having failed to move for mistrial, the defense cannot now raise the issue for the first time. Wormser, supra. But we note also that given the context in which the question was asked, it cannot be said that the question was intended to draw the jury's attention to Felton's failure to take the stand. We therefore find this error to be without merit.

ASSIGNMENT OF ERROR NO. 2
The defendants argue by this assignment of error that the trial court erred when it denied their motion for a mistrial based on the introduction of inculpatory statements which were not disclosed during pre-trial motions. The defense, however, does not indicate to which statements it objects or of which specific statements it did not receive notice.
A review of the record shows that the defendants filed a Prayer for Oyer in which they specifically requested that they be provided with any oral confessions and/or statements or admissions of an inculpatory or exculpatory nature. The State filed a written answer stating that it was not aware of any confession or statements made to N.O.P.D. officers. The State further answered that it was in possession of oral inculpatory statements. There were *411 no specific statements provided by the State in its answer, however.
On April 9, 1985 a motion hearing was held at which time defense orally requested compliance with its Prayer for Oyer. The State responded by saying that after one of the lay witnesses had seen the victim's body and inquired as to what had happened, one of the defendants said "Don't worry about him. He is dead". The State also indicated that this was the only inculpatory statement of which it was aware. The trial court ordered the State to give notice to defendants five days prior to trial of any other inculpatory statements of which it gained knowledge, or the State would not be able to admit them into evidence.
At trial Harold Ward testified that Myron Hodges informed Darryl Esnault that he had had an argument with his girlfriend and so needed assistance in getting his things from the apartment above the bar. The defense objected on the grounds that they had not been given proper notice of the statement. They moved for a mistrial.
The trial court ruled as follows, with the following response by the defense:
BY THE COURT:
Motion for mistrial is denied. These are res gest[ae] statements and I am not quite sure whether or not you were told of all of these statements, but I know you were told some of the statements. As a matter of fact, the Court made you aware after reading the entire folder that it was a statement made to Ward, I believe, to this man here, and the nature of the statement was written down by me on a note to Mr. Jones together with the sketch.
BY MR. JONES:
We have been made aware of one statement which was allegedly made to Aguillard and one statement was made which may have been made to Ward. Neither of them had anything to do with this.
I will point out that the State this very morning gave us notice of intention to use some inculpatory statements and they wrote down that the statements were made to Esnault, Aguillard and Ward while driving around the city. We have never had any indication whatsoever, on the record or off the record, that there were any statements made by either of these defendants to anyone in or near Flynn's Den other than the business about, "Don't worry about him, he's dead."
BY THE COURT:
Noted for the record. Mistrial denied.
It is clear, therefore, that the defense did receive notice of some of the statements offered into evidence. Later during trial the defendant reurged their motion. The following transpired:
BY THE COURT:
You made the motion previously and the motion previously made for a mistrial was denied. Res gest[ae] statements were made. You were advised of the statement. You were told by me. As a matter of fact, when I read the entire folder I read the entire report. I have found that there is an inconsistency in the report in the portion that I gave you and for that reason you got that portion and you may question Mr. Ward on that portion if you wish to. Motion for a mistrial is denied.
BY MR. HARRIS:
In connection with that motion we move that the statement be placed in camera, that the letter from the court be placed in camera along with it, along with the information submitted to us, along with the motion, of course. That is a matter of record.
BY THE COURT:
Sure. You have that handwritten letter with you?
BY MR. JONES:
I don't have it here.
BY MR. HARRIS:
That will be part of the in camera stuff we would like to have sealed.
BY THE COURT:
It will be sealed.
*412 There is no evidence in the record concerning the handwritten note by the trial court. The other in camera evidence was the written statement made by Harold Ward to the police. The trial court allowed the defense to discover for impeachment purposes only one inconsistent statement made by Ward. The rest of the statement was sealed. This sealed statement does not, however, appear in the record.
The defense also objected to a statement made by Myron Hodges. This statement was made to Ward after Myron learned that his brother had taken the victim's car with the property. That statement was, "My God, I don't understand why he would do something like this. He took my shit. He is probably going to sell it and he knows my shit is on the line for what I just did". The trial court denied the motion.
Code of Criminal Procedure Article 768 provides:
Art. 768. Same; use of confession or inculpatory statement; notice to defendant prior to opening statement
Unless the defendant has been granted pretrial discovery, if the state intends to introduce a confession or inculpatory statement in evidence, it shall so advise the defendant in writing prior to beginning the state's opening statement. If it fails to do so a confession or inculpatory statement shall not be admissible in evidence.
The Louisiana Supreme Court in State v. Sneed, 316 So.2d 372 (La.1975) interpreted this statute to mean that the State must give sufficient notice of each confession or inculpatory statement it intends to use, with sufficient specificity as to date or occasion and as to persons to whom given, as to afford adequate notice sufficient to permit the defendant a fair opportunity to meet the issue. Sneed at 376. The court qualified this rule however and stated that where substantial compliance with the article's purpose has been met through other pretrial pleadings, the technical deficiency of the notice may not bar introduction of the statement.
In State v. Miller, 490 So.2d 486 (La.App. 4th Cir.1986) we held that where the defendant is not prejudiced by the omission, or if other evidence against him is overwhelming, admission of statements which should have been revealed in pre-trial discovery is harmless error.
Two state witnesses testified in detail that they saw the defendants with the victim on the night of the killing. One witness, Harold Ward, testified that when he saw the victim's body in the bar he inquired about it. Myron commented "Don't worry about it. Fuck it. He is dead". Ward and Esnault both testified that Myron Hodges told them that if they saw anything in the news not to say anything to anyone. Ward also testified that Myron Hodges told him that he hit the victim with a crescent wrench. Both defendants were seen carrying equipment from the victim's apartment. The victim's property was later found at the defendants' home. One State witness testified that Myron Hodges gave him the victim's car.
Under the rationale of Miller, supra the lack of notice in this case does not warrant reversal. The defense was given pre-trial notice of several inculpatory statements including the statement by Myron Hodges to Ward, Esnault and Aguillard while riding around the city that "his shit was on the line". Given the nature of the statements of which the defense was notified as well as the overwhelming evidence against the defendants, we find any error to be harmless.

ASSIGNMENT OF ERROR NO. 3
In this assignment of error the defendants assert that the court erred when it denied their motion to suppress the physical line-up identification.
The defendants argue that the physical line-up was unduly suggestive, because the line-up included both defendants instead of having a separate line-up for each defendant. The defendants also argue that they were the only subjects in the line-up wearing red wrist bands. They further argue that they requested that their private counsel be present, but that this request was denied.
*413 We must first determine whether the procedure was so unnecessarily suggestive and so conducive to an irreparable mistaken indentification that the defendants were denied due process of law. State v. Neslo, 433 So.2d 73, 78 (La.1983); State v. Tribbet, 415 So.2d 182 (La.1982); Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). A line-up is unduly suggestive if the identification procedure displays the defendant so that the witness' attention is focused on the defendant. Neslo, supra at 78; State v. Nicholas, 397 So.2d 1308 (La.1981) quoting State v. Robinson, 386 So.2d 1374 (La. 1980).
In this case the defendants were placed in a physical line-up with six (6) other subjects on January 11, 1985. Myron Hodges was the number three subject in the line-up. Felton Hodges was the number six subject in the line-up. The defendants did not request that separate line-ups be held.
Review of S-51 shows that Felton Hodges had a red wrist band on him. There is no evidence from S-51 that Myron Hodges had on a red wrist band or any other type wrist band, but the photograph does reflect that one other individual was wearing a wrist band. Review of the exhibit further shows that all of the men were similar in appearance, including skin coloration, height, weight and clothing. Furthermore, the officer who conducted the physical line-up testified that the standard procedures in conducting line-ups were closely followed. Based on the totality of the circumstances, we can not say that the physical line-up was unduly suggestive. State v. Stucke, 419 So.2d 939, 943 (La.1982); Nicholas, supra.
In addition, the defendants' argument that they were denied the right to counsel at the physical line-up is not supported by the record. Officer Himel testified that the defendants did not request private counsel and that counsel from the Orleans Indigent Defender Program was present. Nevertheless, "[a]bsent special circumstances the presence of counsel is not required at pre-indictment line-up." State v. Bickham, 404 So.2d 929, 933 (La. 1981); Kirby v. Illinois, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). In Kirby, the court held that the right to counsel was explicitly limited to a criminal prosecution, which commences only with the institution of an adversarial judicial proceeding by formal charge, preliminary hearing, indictment, information or arraignment. Kirby, supra at 92 S.Ct. 1882.
In the instant case the physical line-up was conducted on January 11, 1985. The formal indictment was not filed until January 17, 1985.
This assignment is without merit.

ASSIGNMENT OF ERROR NO. 4
In this assignment of error the defendants argue that the trial court erred when it denied their motion to suppress the photographic identification.
The defendants argue that the photographic identification of Myron Hodges by Eugene Aguillard was made under unduly suggestive circumstances. They argue that the photograph of Myron was placed on the edge of a table of one of the officers at the police station after Aguillard had been unable to identify Myron on two separate occasions.
In determining whether photographic line-ups were unduly suggestive, we consider whether the identification procedure displayed the defendant so that the witness' attention was focused on the defendant, State v. Smith, 430 So.2d 31 (La.1983), and whether there were sufficient resemblances of physical features and characteristics of the persons in the line-up to the defendant. State v. Nicholas, supra; State v. Roberson, 445 So.2d 12, 14 (La. App. 4th Cir.1983).
While at the police headquarters Aguillard was shown a photographic line-up consisting of six pictures. He was unable to identify the defendants from this array of pictures. After returning from the restroom Aguillard saw a photograph of Myron Hodges among several others lying on a table. Detective Saucier testified *414 that the photograph was developed from a roll of film which was found at the victim's apartment. He also testified that he had gathered the photos in order to conduct another photographic line-up. The Police Department was unable to later locate the remaining photographs. Saucier also testified that Aguillard was not coerced, threatened or intimidated into choosing the photograph.
At trial there was some conflict as to the exact picture which Aguillard selected at the police station. Nevertheless, he testified that the photo shown to him at trial was that of Myron Hodges. He further corroborated Saucier's testimony that the photo he had seen at the police station was among several others.
Aguillard testified that there was no suggestiveness exercised by the police when he chose the photograph.
Thus, the photo identification by Aguillard was not tainted.
This assignment is without merit.

ASSIGNMENT OF ERROR NO. 5
By this assignment of error the defendants argue that the trial court erred when it failed to suppress the physical evidence found in their apartment.
Defendants argue that the search warrant obtained by the police was defective as it authorized a search of one 1513 North Prieur which was not their home. They further argue that there were no exigent circumstances to justify the search of their home without first obtaining a valid warrant. Defendants also argue that the officers who searched their home coerced their parents into giving permission to search their apartment which was separate from that of their parents.
Officer Saucier testified that after Aguillard made the identification of Myron Hodges, Aguillard went with Detective Cade to the 1500 block of North Prieur Street where Aguillard identified 1513 North Prieur as being the house where he had taken Myron Hodges and the victim's property. It was Cade who gave Saucier the 1513 North Prieur Street address. Saucier acknowledged that he and several officers went to 1513 North Prieur to execute the warrant. Before entering 1513 North Prieur, Saucier noticed the defendants leaving 1519 North Prieur. The defendants were stopped and subsequently arrested.
Saucier testified that the defendants' parents confronted him and Detective Rice outside of their home. The officers asked if they could speak somewhere else in private. Mr. Smith, the defendants' stepfather, suggested they come in their home at 1519 North Prieur. The officers explained the charges to the Smiths and stated that they believed that the victim's property was at their residence. After reading the complete consent to search form the Smiths signed the consent form, and the officers searched the rear apartment of the house wherein they found the victim's property.
Mr. and Mrs. Smith testified at the hearing on the Motion to Suppress and at trial. Mr. Smith stated that the officers suggested that they go inside. He further stated that he signed the consent document, though his vision was poor. He also testified that he signed the form because he had never been in trouble before and his wife was shaking. He told the officers that he lived in the front apartment at 1519 North Prieur and that the defendants lived in the rear apartment. He led the officers to the rear apartment.
Mrs. Emelda Smith, the defendants' mother, testified that she gave the officers permission to search the front and rear apartments. She also testified that the officers informed her that though they did not have a search warrant, they could get one and then force entry into the defendants' apartment. She testified that there were two separate apartments. She and her husband lived at 1519 N. Prieur. The defendants and their sister lived at 1521½ N. Prieur. The Smiths signed the consent to search form and offered no objection to the search.
In the instant case the State met its burden of proof concerning the voluntariness of the consent. The testimony of the officers, that of the defendants' parents, *415 and the consent form signed by the defendants' parents show that a valid consent was given.
Nevertheless, the crux of this issue is whether the defendants' parents had the authority to give the consent to search the defendants' apartment.
Mrs. Smith testified that she paid rent and utilities for both apartments. She also testified at the Motion to Suppress that she lived at 1519 and 1521 North Prieur Street. She testified that there was no municipal number on the rear apartment and that she had keys to the rear apartment. Mrs. Smith further testified that the defendants did not have a lease but merely helped her with the rent. Given this testimony we conclude that the Smiths had the authority to give consent to the police to search the apartment of the defendants.
This assignment lacks merit.

ASSIGNMENT OF ERROR NO. 6
By this assignment of error the defendants argue that the trial court erred when it denied their motion to Quash the Petit Jury Venire.
Defendants argue that the jury veniremen in this case were initially served through mail and then later subpoened by hand after appearing in court. Defendants argue that C.Cr.P. art. 418 requires that jury veniremen be served with a subpoena by a process server. The defendants argue that this procedure denied them their constitutional right to be tried by a jury which represents a cross-section of the community absent a showing by the State that the procedure used did not qualitatively alter the resulting panel.
C.Cr.P. art. 418 describes with particularity the indiscriminate procedure by which the jury commission must draw the petit jury. It reads:
Art. 418. Drawing petit jury venire in Orleans parish; number chosen; term of service; petit jury venire list
In Orleans Parish upon order of the court the jury commission shall draw a petit jury venire.
The jury commission shall draw indiscriminately and by lot as many name slips from the general venire box as a court may direct, not less than seventy-five, for service as petit jurors during the next monthly session of that judge's section of court.
The commission shall prepare a list of the persons drawn which shall constitute the petit jury venire list. This list, together with the name slips drawn, shall be delivered to the judge ordering the drawing.
The commission shall prepare subpoenas directed to the persons on the petit jury venire and cause them to be served.
La.R.S. 15:112 mandates that all subpoenas, notices, process orders and papers issued by the jury commissioner be served by a chief process server or deputy process server. It reads in pertinent part:
§ 112. Parish of Orleans; process servers
All subpoenas, notices, process, orders and papers issued by the jury commissioners in the parish of Orleans shall be served by a chief process server or one of his deputies, which said chief process server and as many deputy process servers as may be necessary shall be appointed by the said jury commissioners.
C.Cr.P. art. 419 describes the instances in which a petit jury venire shall be set aside. It reads:
Art. 419. Challenge of venire not permitted except for fraud or irreparable injury
A general venire, grand jury venire, or petit jury venire shall not be set aside for any reason unless fraud has been practiced or some great wrong committed that would work irreparable injury to the defendant.
This article does not affect the right to challenge for cause, a juror who is not qualified to serve.
In the present case the defendants do not allege fraud or a great wrongdoing which caused them irreparable injury. It is the defendant who bears the burden of proof when requesting that the venire be struck. See State v. Brown, 414 *416 So.2d 726 (La.1982); State v. Paris Properties, Inc., 503 So.2d 594 (La.App. 4th Cir. 1987); State v. Kirts, 447 So.2d 1 (La.App. 3rd Cir.1983). In Paris Properties, we held that where defendants failed to allege that fraud or a great wrong had been committed by noncompliance with R.S. 15:112, or that the composition of the jury pool for the month in which the defendants were prosecuted was not representative of the population as a whole, non-compliance with R.S. 15:112 was not sufficient to warrant quashing the jury venire. Paris Properties, supra at 595. In that case there was sufficient evidence in the record to show that contrary to the defendants' argument, the response to the mailed notices indicated that a more representative jury pool was generated by mailing the jury duty notices than by the personal service method. Paris Properties, supra at 595.
The defendants in this case have presented no statistical data concerning the response to the notices mailed in comparison with data describing the response when process service is made. In addition they have not met the burden as established in C.Cr.P. art. 419.
This assignment is without merit.

ASSIGNMENT OF ERROR NO. 7
By this assignment of error the defendants argue that the trial court erred when it did not replace a juror who slept during the trial.
The defendants allege that one of the jurors "slept constantly" despite a warning from the court. The defendants, however, have failed to cite any evidence from the record to support this contention and in fact the record does not support defendants' argument. This assignment is without merit.

ASSIGNMENT OF ERROR NO. 8
By this assignment of error the defendants argue that the trial court erred when it denied the defendants' objection to the admission of gruesome photographs of the victim. They argue that the prejudicial effect of the photographs outweighed their probative value. We disagree.
The trial court allowed the State to enter into evidence five pictures of the victim. These pictures are gruesome as they depict the severely bludgeoned and blood-stained body of the victim. In most of the pictures the victim's face is disfigured.
The admissibility of allegedly gruesome photographs requires a determination of whether their probative value outweighs their probable prejudicial effect on the jury. State v. Redwine, 337 So.2d 1041 (La.1976). Photographs which are calculated to arouse the sympathies or prejudices of the jury are properly excluded if they are entirely irrelevant or not substantially necessary to show material facts or conditions. State v. Alexander, 252 La. 564, 211 So.2d 650 (1968) quoting State v. Morris, 245 La. 175, 157 So.2d 728 (1963); State v. Williams, 497 So.2d 333, 339 (La.App. 2nd Cir.1986). Photographs of the body of the deceased victim have generally been held relevant to prove the corpus delicti, to corroborate other evidence of the manner in which death occurred, to establish the location, severity and number of wounds, and to establish the identity of the victim. Williams, supra at 339; State v. Morgan, 211 La. 572, 30 So.2d 434 (1947).
In the instant case Dr. McGarry, coroner, was questioned about the photographs relative to the cause of death. The State asked Dr. McGarry to explain the substance found around the nose and mouth of the victim. The doctor responded that it was a mixture of blood and secretions from the lungs and the bronchial tubes. The doctor testified that as a person is struggling to breath after being stabbed in the lungs the blood comes up into the air that he is breathing and mixes with the air, forming foamy material that comes out of the nose and mouth.
Thus, we hold that photographs were properly admitted to prove the nature, scope and extent of the wounds received by the deceased and the cause of death. State v. Morgan, supra; State v. Morris, supra.
The other photo exhibits at issue show the location of the victim's body relative *417 to other objects in the bar. This evidence could be deemed relevant with regard to the testimony of Darryl Ward to the effect that while with Myron Hodges he saw the victim lying on the floor in the bar. Moreover, the photographs in general corroborate Ward's testimony that Myron Hodges told him that he hit the victim with a crescent wrench. Under these circumstances, we do not find that the alleged prejudicial effect of the photographs outweighed their probative value.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 9
By this assignment of error the defendants argue that the trial court erred when it denied their objection to the admission of various objects "in globo", as being wholly irrelevant and immaterial.
R.S. 15:441 defines relevant evidence as follows:
§ 441. Relevant evidence defined; facts admissible
Relevant evidence is that tending to show the commission of the offense and the intent, or tending to negative the commission of the offense and the intent.
Facts necessary to be known to explain a relevant fact, or which support an inference raised by such fact, are admissible.
The standard of relevancy in Louisiana is based on logic and experience. State v. Whittaker, 463 So.2d 1270, 1272 (La.1985); State v. Davenport, 445 So.2d 1190 (La.1984). Evidence is relevant if it makes any fact indicating guilt or innocence more or less probable. Whittaker at 1272.
A review of the record shows that the defendants objected to the admission of S-36 into evidence. This exhibit consisted of the carload of material taken from the victim's automobile. The defendants argue that while there was testimony concerning some of the items, there were other items in the exhibit which were not mentioned at trial. The defendants, however, only objected to "a portion" of the exhibit without indicating which portion.
A great deal of testimony was elicited at trial from the State's witnesses about the various items taken from the victim's apartment on the night of the crime. Further, the defendant Myron Hodges also testified concerning these items. Absent a clear abuse of discretion and a specific objection upon which the trial court could rule, we find this assignment of error to be without merit. State v. Rault, 445 So.2d 1203 (La.1984).

ASSIGNMENT OF ERROR NO. 10
By this assignment of error the defendants argue that the trial court erred when it did not compel the production of all photographs and undeveloped films found at the scene of the crime.
Defendants assert that under the provisions of LSA-C.Cr.P. art. 718 the State was required to supply the defense with the photographs and negatives pursuant to their Motion For Discovery and Inspection.[1] The defense, however, cites no prejudice to them from the State's failure to produce the items.
The Louisiana Supreme Court has stated on numerous occasions that the decision in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), while requiring the prosecution to inform the defendant of exculpatory evidence, does not require the State to open its files to the defendant to search and decide what is exculpatory. State v. Linkletter, 345 So.2d 452, 454 (La. 1977); State v. Nix, 327 So.2d 301 (La. *418 1976), cert. den., Fulford v. Louisiana, 425 U.S. 594, 96 S.Ct. 1732, 48 L.Ed.2d 198 (1976); State v. Major, 318 So.2d 19 (La. 1975). In Linkletter the court stated that the Louisiana cases hold, in effect, that the State must, upon request, furnish the defense with evidence which is material to the issues and favorable to the defense. And, if it can be shown that the State, after request, has deliberately withheld from the trial specific evidence favorable to the defense, the error would warrant reversal of the conviction. Linkletter, at 454.
Detective Saucier testified that a roll of undeveloped film was found in the victim's apartment. Saucier had the film developed and received the negatives and five prints. One of the photographs developed from the film was of Myron Hodges. It was from this photo that Aguillard later identified Myron Hodges. At trial, Saucier stated that the other four photographs were thrown out or misplaced, so that he was unable to produce them.
Based upon this testimony, it cannot be said that the State deliberately withheld from the defense specific evidence favorable to the defendants. Furthermore, the defendants did not clarify the specific prejudice which resulted to them by the State's failure to produce the photographs. Hence, the defendants have failed to show the relevance of the evidence which made any fact indicating guilt or innocence more or less probable. R.S. 15:441; Whittaker, supra; Davenport, supra.
This assignment of error is without merit.
For the foregoing reasons the defendants' convictions and sentences are affirmed.
AFFIRMED.
NOTES
[1] C.Cr.P. art. 718 provides in pertinent part:

Subject to the limitation of Article 723, on motion of the defendant, the court shall order the district attorney to permit or authorize the defendant to inspect, copy, examine, test scientifically, photograph, or otherwise reproduce books, papers, documents, photographs, tangible objects, buildings, places, or copies or portions thereof, which are within the possession, custody, or control of the state, and which:
(1) are favorable to the defendant and which are material and relevant to the issue of guilt or punishment, or
(2) are intended for use by the state as evidence at the trial ...